309 So.2d 290 (1975)
STATE of Louisiana ex rel. William J. GUSTE, Jr., Attorney General
v.
The COUNCIL OF the CITY OF NEW ORLEANS and New Orleans Public Service, Inc.
Nos. 55218, 55219 and 55227.
Supreme Court of Louisiana.
February 24, 1975.
Rehearing Denied March 31, 1975.
*291 Blake G. Arata, City Atty., David S. Cressy, Asst. City Atty., for applicant in 55218, for respondents in 55219 and 55227.
Chaffe, McCall, Phillips, Toler & Sarpy, Harry McCall, Jr., James P. Farwell, New Orleans, for applicant in 55219, for respondents in 55218 and 55227.
Monroe & Lemann, Andrew P. Carter, Eugene G. Taggart, New Orleans, for applicant *292 in 55227, for respondents in 55218 and 55219.
William J. Guste, Jr., Atty. Gen., Louis A. Gerdes, Jr., Robert L. Danner, Jr., Asst. Attys. Gen., for respondents in all cases.
David A. Marcello, Director, Louisiana Center for the Public Interest, New Orleans, for amicus curiae.
John M. Madison, Jr., Wilkinson, Carmody & Peatross, Shreveport, for amicus curiae, Southwestern Electric Power Co.
MARCUS, Justice.
On December 21, 1972, the Attorney General of Louisiana instituted this suit against the Council of the City of New Orleans [hereinafter referred to as the Council] and New Orleans Public Service, Incorporated [hereinafter referred to as NOPSI], seeking a declaratory judgment that the late charge provided in the rate schedules promulgated by NOPSI and approved by resolution of the Council for utility services and the city tax collected thereon were illegal and void. Preliminary and permanent injunctions against their levy and collection were also sought. The action was brought on behalf of the state of Louisiana as a representative of the consumer public of Orleans Parish and as a consumer of gas and electricity by state agencies located in Orleans Parish. As another supplier of electrical power in the city employing similar billing practices, Louisiana Power & Light [hereinafter referred to as LP&L] intervened in the proceedings to assert and defend its interests.
Pursuant to a rule on the matter, the trial court denied the application for a preliminary injunction on the ground that no showing of irreparable injury, required by article 3601 of the Louisiana Code of Civil Procedure, had been made. After trial on the merits, judgment was rendered in favor of all defendants, dismissing plaintiff's suit. Plaintiff appealed the judgment to the court of appeal, which reversed the district court judgment. State ex rel. Guste v. Council of the City of New Orleans, 297 So.2d 518 (La.App. 4th Cir. 1974). Upon defendants' applications, we granted writs of certiorari to review the judgment of the court of appeal. 300 So.2d 497, 498 (La.1974).

FACTS
An understanding of the public utility concept that has developed in this country is essential to the resolution of this controversy. Fundamentally, two characteristics of operation peculiar to those enterprises that supply continuous utility services through permanent physical connections between the plant of the supplier and the premises of the consumer (i. e., public utilities) require their public regulation: (1) the economic necessity of the services to the community, and (2) the severely localized and restricted market for utility services (so limited because of the necessarily close physical connection between the utility plant on the one hand and the consumers' premises on the other) that, combined with the economies of a large-scale enterprise, requires monopoly status to survive (i. e., competition within such a limited market would substantially increase the costs of services and/or bankrupt the rivals). See J. Bonbright, Principles of Public Utility Rates 7-17 (1961). Thus, in exchange for their favored status, furnishers of utility services submit to public regulation, which generally sanctions utility rates that provide a limited but reasonable return on the investment of the public utility. In effect, the public regulation acts as a substitute for competition. Id.
The city of New Orleans is authorized by its constitutional grant of home rule to regulate those utility companies that furnish services within its jurisdiction. La.Const. art. 6, § 7 (1921); id. art. 14, § 22, as amended by Acts 1950, No. 551; see *293 State v. City of New Orleans, 151 La. 24, 91 So. 533 (1922).[1] Pursuant to this authority, the home rule charter of the city empowers the Council to fix "... any rate, fare or charge for any ... service rendered, or to be rendered, by any public utility ..." after appropriate public hearings on the matter. Home Rule Charter of the City of New Orleans § 4-1604 (1954).
The present schedules providing rates for utility services resulted from an application filed with the Council by NOPSI on January 4, 1972. Pursuant to this application, public utility consultants were appointed to represent the city, and notice was given of public hearings on the application. After the hearings were held, and all sides had presented their witnesses and evidence and cross-examined the witnesses offered by their adversaries, the Council unanimously adopted its resolution of November 22, 1972, approving rate schedules that were projected to allow NOPSI a fair and reasonable return on invested capital, which had been fixed by the Council at 7.07 per cent of a rate base[2] computed to provide minimum rates to utility customers on the one hand and to enable NOPSI to furnish adequate and safe service to its customers, maintain its potential to meet future service requirements, and protect its credit and its ability to attract capital at reasonable costs, on the other.
Additionally, a city ordinance authorizes the levy and collection of a city sales tax in the amount of three per cent (3% of the amount due for utilities services each month. The new rate schedule necessarily also increased the total taxes due from the consumer, since the percentage is calculated on the increased rates.
The quantitative amounts of the rate increases and sales tax are not at issue here; rather, the challenge posed by this suit is directed to the provision for late payment included in and adopted as part of the rate schedules and that portion of the sales tax imposed thereon.[3] The late payment provision reads as follows:
The net monthly bill calculated in accordance with the above rate will be increased ten per cent if payment is not made on or before the due date shown on the bill, which shall not be less than ten days after it is rendered.
The amount due on the due date is denominated the "Net Total" on the monthly invoice; the amount due as a late payment, which is the "Net Total" increased by ten per cent (10%), is designated as the "Gross Total."

ISSUES
The gravamen of plaintiff's complaint is that: (1) the late charge is an arbitrary and discriminatory penalty that is imposed unjustly against those customers paying beyond the monthly due date; (2) the late charge penalty constitutes "interest" exceeding the maximum legal rate and, hence, is usurious; and (3) as usurious interest, the late charge also constitutes a deceptive *294 trade practice proscribed by the Unfair Trade Practices and Consumer Protection Act.

I.
As noted above, because public utilities enjoy monopoly status and are not subject to the competitive forces of the marketplace, public regulation of their affairs must act as a substitute to prevent a utility from dealing unfairly with its customers. Included in this public regulation is the prevention of unreasonable discrimination by the utility among its customers through various business practices (e. g., rebates, preferential charges, and service inequalities.)[4] While public utilities may reasonably distinguish among classes of customers by charging varying rates for varying services, any discrimination among customers as to the rate charged for the same service is uniformly considered impermissible.[5]
Unlike many other states, Louisiana has no statute of statewide application that proscribes unreasonable discrimination by a utility in rate-making. However, the courts of this state have jurisprudentially adopted the generally prevailing rule that a utility's rate structure must be nondiscriminatory.[6]
The Attorney General characterizes the late payment rate here in question as "discriminatory, unjust, and confiscatory," on the ground that it imposes a penalty on the class of late payers in excess of expenses incurred by NOPSI as a result of the delay of that group in paying its bills. He further alleges that this discrimination works a particular hardship on those customers living on fixed incomes that are payable only once a month (e. g., Social Security recipients, retired federal employees and service personnel and welfare recipients). Finally, the ruling of the Louisiana Public Service Commission, which has rate-making jurisdiction over utilities situated and doing business in other parts of the state, imposing a five per cent (5%) delinquency charge (rather than ten per cent, as here) on bills paid later than 25 days from the billing date (rather than ten days, as here) is cited as a persuasive standard of reasonableness to which NOPSI should be required to conform.
Thus, the precise question here is whether the late charge billing practice employed by NOPSI comports with the standards of reasonableness required of classifications drawn among utility customers by a rate structure. In reviewing the reasonableness of the classification before us, appropriate deference is owed to the determinations made by the legislative body vested with rate-making authority. As noted above, the Council of the city of New Orleans is vested with the sole legal authority to regulate the rates charged by companies furnishing utility services in the city of New Orleans. Recognition of that authority requires that we limit our review to a determination of whether the late charge is reasonable and refrain from merely substituting our judgment for that of the Council. Cf. O. Pond, A Treatise on the Law of Public Utilities § 940 (1925).[7]
*295 Considering the arguments of the Attorney General in light of these principles, we are unable to declare that the late payment charge employed by NOPSI is unreasonable or unlawful. The billing practice used by NOPSI imposes the ten per cent (10%) penalty on a class of customers who have one characteristic in common, viz., they have failed to pay their monthly bill within ten days of the billing date. NOPSI incurs certain additional costs as a result of the failure of this group (or classification) of customers to pay promptly, and the late charge imposed on the late payers is designed to offset these expenses. According to the testimony of Michael Burns, the Manager of the Customer Accounting Division of NOPSI, the additional costs are incurred in the collection of overduce accounts in the field, reconnection of previously disconnected service,[8] uncollectible accounts, and the maintenance of security deposits. Mr. Burns' testimony also indicated that no substantial disparity existed between the expenses thus incurred and the total revenue produced by the late charge.[9] Thus, it cannot be said that NOPSI enjoys a substantial profit as a result of its late billing practice.[10] It is argued that fairness requires that all NOPSI customers bear the expenses described above, rather than the class that includes only late payers. However, those expenses are not incurred by the class of customers that pays its bills promptly; thus, it is hardly unreasonable to free this group from the obligation to defray expenses for which they are not responsible.
Moreover, testimony given by John H. Erwin, Treasurer and Assistant Secretary of LP&L, in the district court demonstrates that, contrary to the charges of the Attorney General, a disproportionately small number of overdue accounts are those of customers below the statistical poverty level. In fact, Mr. Erwin determined from his statistical study that low income customers were beneficiaries rather than victims of the late payment charge, since wealthier customers with larger accounts were generating a disproportionately large portion of the revenues from late payments charges. Thus, he concluded that, if the late charge billing practice was terminated and the expenses incurred from late payments evenly distributed among all customers by a general rate increase (as has been suggested by the Attorney General), lower income customers would bear a greater proportion of these costs than they now do. The evidence is also clear that it was the common practice of both NOPSI and LP&L to adjust the monthly due dates of customers on small, fixed incomes who suffered hardships under the due dates previously assigned them. In sum, there is no evidence to substantiate the charge that the ten per cent penalty works a harsh discrimination against lower fixed income customers.
Finally, in noting the ruling of the Louisiana Public Service Commission offered by the Attorney General as an alternative to the billing procedures employed here, it suffices to say that the existence of another method of collection does not preclude our determination that the method before us is nonetheless reasonable. The choice of which of two or more reasonable methods should be employed remains the Council's. Our review is limited *296 to a determination of whether the method chosen was reasonable, not whether it was the most desirable of those available. Having made that determination, we need not consider the merits of the alternative proposed.

II.
In characterizing the late charge as usurious interest, the Attorney General relies upon article 1935 of the Louisiana Civil Code, which provides:
The damages due for delay in the performance of an obligation to pay money are called interest. The creditor is entitled to these damages without proving any loss, and whatever loss he may have suffered he can recover no more.
Based upon this definition, it is argued that the late charge constitutes "... damages due for delay in the performance of an obligation to pay money ...." As interest, the late charge may not exceed eight per cent (8%) of the principal debt, La.Civil Code art. 2924 (1870), as amended by Acts 1972, No. 454, § 9; hence, the ten per cent (10%) late charge is said to constitute usurious interest.
This argument overlooks the clear language of article 2924 of the Civil Code and the settled jurisprudence of this state, both of which are to the effect that the usury statutes apply to loans but not to consumer credit sales. Id.; e. g., Motes v. Van Wagner, 188 So.2d 704 (La.App. 4th Cir. 1966) and cases cited therein. As a sale of commodities (i. e., electricity and gas), the monthly billing by NOPSI clearly constitutes a consumer credit sale rather than a loan. Consumer credit sales are ordinarily governed by the Consumer Credit Law. La.Acts 1972, No. 454, § 1, enrolled as La.R.S. 9:3510-9:3568 (Supp.1974). However, recognizing that utility rates are fully regulated by other means, the Consumer Credit Law specifically excludes such rates from its operation.[11] Thus, the appropriate basis for regulation of utility rates is neither the usury statute nor the Consumer Credit Law; properly, regulation of public utility rates, including charges for delayed payment, rests solely with that agency or subdivision of the state vested with authority to supervise the operation of the utility, subject to judicial review of the reasonableness of the regulation. Hence, the charge that the late charge billing practice employed by NOPSI constitutes usurious interest is unfounded.

III.
The final complaint offered by the Attorney General is that, as usurious interest, the late charge billing practice also constitutes a deceptive trade practice proscribed by the Unfair Trade Practices and Consumer Protection Law. La.Acts 1972, No. 759, § 1, enrolled as La.R.S. 51:1401-51:1418 (Supp.1974). Since, as noted above, the late charge is not usurious interest, this charge is also unfounded. Moreover, public utilities are exempt from regulation by the Act. Id. 51:1406.

CONCLUSION
The charge imposed by NOPSI for late payment in the amount of ten per cent (10%) above the amount originally due within ten days from the monthly billing date is a reasonable method of encouraging prompt payment and offsetting the expenses incurred by NOPSI as a result of late payments by customers. It is neither arbitrary nor discriminatory; rather, it allocates and distributes those expenses among the customers responsible for them. The *297 sale of energy, a commodity, is a consumer credit sale, which is not subject to the usury statutes. Hence, the late payment charge, which is part of the price paid for the commodity, is not usurious interest. Moreover, public utility rates and charges for delayed payment are excluded from the regulatory embrace of the Consumer Credit Law. Thus, their regulation is the exclusive province of the appropriate regulatory bodyhere, the Councilsubject to judicial review for reasonableness. Finally, the method employed by NOPSI is not a deceptive trade practice proscribed by the Unfair Trade Practices and Consumer Protection Law.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed, and the judgment of the district court is reinstated.
DIXON, J., concurs.
CALOGERO, J., recused.
NOTES
[1] The new state constitution leaves this grant of power undisturbed. La.Const. art. 6, §§ 4, 6 (1974).
[2] As explained by one commentator,

"[r]ate base' represents the total investment in, or fair value of, the facilities of a utility employed in providing its service. That figure is multiplied by a percentage, called `rate of return,' to arrive at the wages of capital, or the allowed return, which orthodox regulation gives the utility an opportunity to earn. ...
A. J. G. Priest, Principles of Public Utility Regulation 139 (1969).
[3] The plaintiff's attack on the legality of the city sales tax as levied herein was neither briefed nor argued before this court. Thus, we would ordinarily consider the argument abandoned. However, the questions regarding the validity of the sales tax and the validity of the rate charge are inexorably bound together; hence, the treatment of the issues presented here with respect to the late charge will necessarily entail a resolution of the legality of the levy and collection of the sales tax under these circumstances as well.
[4] For a thorough discussion of unlawful discriminatory practices see A. J. G. Priest, Principles of Public Utility Regulation 285-326 (1969).
[5] "And the same observation is true as to quality and amount of service, extension of facilities, collection of accounts and rules and regulations generally." Id. at 288.
[6] See Hicks v. City of Monroe Utilities Comm'n, 237 La. 848, 112 So.2d 635 (1959); Johnson v. Mayor, 129 So. 433 (La.App. 2d Cir. 1930).
[7] Although the Council is an elected legislative body, in this context it functions much like an administrative agency vested with the authority to regulate utilities. Thus, the principles of judicial review ordinarily employed for administrative actions are useful here as well. For a thorough discussion of the scope of judicial review of administrative action see K. Davis, Administrative Law Text 545-56 (3d ed. 1972).
[8] This is partially defrayed by a $1.50 service charge assessed to the customer.
[9] The evidence establishes that, for the year ending December 31, 1972, the total costs incurred from the four areas designated above totaled $1,026,900.00. The revenue derived during the same period from the delayed payment charge was $1,031,610.00. Thus, the revenue exceeded costs by $4,710.00.
[10] Additionally, because its rate of return on capital is limited to 7.07 per cent of the rate base, NOPSI's operation depends heavily on a substantial, short-term cash flow. It can reasonably be assumed that dilatory payments of utility bills reduces the cash flow and causes NOPSI to incur the additional expense of borrowing funds for continued operation.
[11] La.R.S. 9:3512(3) (Supp.1974) makes the following exclusion:

transactions under public utility ... tariffs if a subdivision or agency of this state ... regulates the charges for the services involved, the charges for delayed payment, and any discount allowed for early payment ....
. . . . .
(Emphasis added.)