DENNIS, Justice.
This appeal is yet another repercussion of the national gas shortage. The issue presented is whether the Louisiana Public Service Commission (Commission) properly reduced rates within its jurisdiction charged to several municipalities by a gas pipeline company for the purpose of removing prejudicial effects caused by the company’s sale of gas to industries at prices below cost under long term contracts, which are not within the statutory jurisdiction of the Commission.
Respondent Sugar Bowl Gas Corporation (Sugar Bowl) distributes natural gas in south Louisiana. For many years it has purchased gas from producers for resale to industries, municipalities and residents. In the 1960’s Sugar Bowl entered long term contracts with several of its industrial customers whereby it agreed to supply large volumes of gas at fixod prices. Prior to 1972 Sugar Bowl also sold gas to several municipalities and publicly owned distributing systems under contract.[1] However, in 1971-2, the Public Service Commission abrogated the cities’ contracts with Sugar Bowl and ordered it to supply gas to them at a rate consisting of its average cost of gas purchased each month plus an additional charge for cost of service and return on investment.
Sugar Bowl is one of three intrastate natural gas common carrier pipelines whose rates and services are partially regulated by the Commission. The vast majority of the gas distributed by these pipelines is sold directly to industrial customers under contract, and this part of the pipelines’ activities is statutorily exempt from regulation *1016 by the Commission. La.R.S. 45:301-303.[2] Because the unregulated rates charged industries by the pipelines remained anchored by long term contracts while the rates fixed by the Commission rose sharply with the average cost of gas in response to the energy shortage, some of the municipally owned distributing systems complained to the Commission of discrimination and inequitable treatment.
On September 15, 1976, the Commission ordered Sugar Bowl to show cause why it should not be required to reduce rates charged the municipalities of Donaldson-ville, Plaquemine and White Castle[3] (cities) to a level equivalent to the average rate charged in sales to its industrial customers. Hearings were conducted in which witnesses testified for the company, the cities, and other consumers. Sugar Bowl furnished, upon the Commission’s request, information regarding the prices and quantities of gas purchased and sold by it during various periods.
After completion of the hearings, the Commission, acting under La.R.S. 45:303, by order dated February 16, 1977, found that Sugar Bowl’s long term contracts with industries resulted in prejudicial effects on rates charged the cities. To remove the prejudicial effects it ordered a reduction in rates by requiring the company to charge each of the cities, for a volume of gas equal to the amount consumed by that city during the year preceding April, 1972, on the basis of Sugar Bowl’s average cost of gas under pre-April 1972 purchase contracts.[4] For any additional gas taken by the cities in excess of pre-1972 usage Sugar Bowl was ordered to charge them on the basis of the average cost of gas purchased under supply contracts entered subsequent to April, 1972. The total charge, however, could not exceed the overall average price for gas paid by Sugar Bowl for the gas purchased during this billing period.[5] In simple terms, the order has the effect of dedicating to the cities, up to the volumes they used prior to April, 1972, Sugar Bowl’s “old gas” which will be acquired at lower costs under the older supply contracts.
On Sugar Bowl’s appeal, the district court issued a preliminary injunction suspending the Commission’s order pending a hearing on the permanent injunction and the merits of the appeal. In its written reasons, the district court found that implementation of the order would cause Sugar Bowl irreparable injury. Although the district court did not single out any error of law or unreasonable factual determination by the Commission, it stated that the rising cost of gas did not create a presumption that industrial sales were prejudicial to the rates charged the cities. The Commission appealed. For the reasons hereinafter stated we affirm.
The Commission’s opinion in the instant case included factual' findings which we summarize as follows: In the 1960’s there was a surplus of natural gas and the long term industrial contracts were consummated by Sugar Bowl on the assumption that adequate supplies would be available through the term of the contract at profitable rates. However, Sugar Bowl’s average *1017 cost of gas is now approximately six times greater than the price it receives in some of its non-jurisdictional sales. The average cost of gas of all three intrastate gas pipelines regulated by the Commission has increased markedly, but from April, 1972 to September, 1976 Sugar Bowl’s average cost increased approximately one-third more than the other pipelines.[6] Sugar Bowl presently purchases annually about 40 million MCF of gas under pre-April 1972 contracts at a weighted average price of 93.2 cents per MCF. Annually it buys approximately 46.8 million MCF of gas under newer supply contracts at a weighted average of $1,515 per MCF. Annual deliveries to the cities total only about 4.1 million MCF, a volume approximately equal to Vioth of the gas purchased by Sugar Bowl from the pre-1972 contracted reserves. An audit conducted in 1975 revealed that all of Sugar Bowl’s jurisdictional gas sales accounted for about 5V2% of the volumes sold but produced approximately 8[3]A% of the revenues. Contracted reserves of gas available to Sugar Bowl through 1981, the expiration date of some of the industrial contracts, amount to 339 billion cubic feet. However, the company has contract commitments to deliver 399 billion cubic feet during this period. Approximately 60.8% of the contracted reserves is considered controlled by corporations affiliated with Sugar Bowl, which is a wholly owned subsidiary of Allied Chemical Corporation.
From these factual determinations the Commission reached conclusions, which we paraphrase as follows: Sugar Bowl purchased gas after 1972 at substantially higher prices than the other intrastate pipelines. The company’s long-term contracts with industries which now require delivery of gas from inadequate reserves for prices substantially less than acquisition costs results in prejudice to the rates charged the cities. The jurisdictional customers should not bear the full impact of the acquisition prices for new gas purchased primarily to fulfill industrial contract commitments when prior contracted reserves were adequate to meet jurisdictional requirements.
The first question before us is whether the Commission correctly apprehended the ambit of authority granted to it by La.R.S. 45:303. The pertinent part of the statute provides that the Commission, upon finding that “any particular direct industrial sale” is “prejudicial” to regulated rates, may order such adjustment of the rates “as may be necessary to remove the prejudicial effect of such direct industrial sale.”[7] By this enactment the legislature, in our opinion, intended to grant the Commission the authority to revise a regulated rate to offset the effects of an undue preference or undue discrimination by a pipeline company in a direct industrial sale. The term “prejudicial” implies injury received due to inequality or partiality. The preceding paragraph of the statute authorizes the Commission to make adjustments in the purchase price of gas considered for rate-making purposes if the acquisition was not “pursuant to arm’s-length contract.”[8] Thus, both paragraphs seem intended to empower the Commission to make adjustments to protect ratepayers from the ef *1018 fects of unjust preferences and discrimination. The redactors’ cross reference[9] and the similarities of purpose suggest that the legislature modeled these provisions of La. R.S. 45:303 on Sections 4 and 5 of the Federal Natural Gas Act of 1938, which prohibits “any undue preference or advantage” and “any undue prejudice or disadvantage” in rates[10] and which authorizes the Federal Power Commission to correct any “unduly discriminatory, or preferential” rate.[11] A cursory survey of treatise writers indicates that prevention of discrimination has been a vital regulatory function since the advent of federal and state statutes dealing with “natural monopolies,” and that the Louisiana statute is couched in typical language. 1 Priest, Principles of Public Utility Regulation, 285 et seq. (1969), [hereinafter referred to as Priest]; Bon-bright, Principles of Public Utility Rates, 369 (1961) [hereinafter referred to as Bon-bright]. Accordingly, we conclude that the Commission correctly decided that it has the authority to adjust regulated rates to compensate for any prejudice caused to such rates by a difference between them and particular direct industrial sale rates which is unduly discriminatory or preferential.[12]
Nevertheless, it appears that the Commission has improperly exercised its authority in this case. The record before us reflects that the Commission did not consider all of the factors necessary to a sound determination that undue discrimination exists between the rates in question. Assuming undue rate discrimination to be a fact, it also does not appear that the Commission proceeded reasonably and prudently in making its adjustment to remove undue discrimination from the rates.
There appears to be unanimity for the proposition that, because absolute equality between classes of service is not a practical possibility, a mere difference in rates, in itself, does not constitute undue or unlawful discrimination.[13] It is axiomatic that discrimination banned as unjust or undue involves preference under substantially similar circumstances or conditions.[14] Different treatment for different classes of customers who have been reasonably classified is not unlawful, although the variations in service or conditions must be substantial to justify differences.[15] In other words, it is only an unreasonable difference in rates between customers or classes of customers that is unlawfully discriminatory.[16] This Court has recognized, in a municipal water utility case, that rate discrimination is objectionable when it “strikes an unfair balance between those in like circumstances having equal rights and privileges.”[17]
Although these principles were evolved in cases dealing with rates and services fully subject to regulatory jurisdiction, La.R.S. 45:303 evinces a legislative intention that they should also be applied in determining whether a gas pipeline company has granted an unduly preferential or *1019 discriminatory non-regulated rate by contract. The Federal Power Act, an enactment similar to the Natural Gas Act, which apparently codifies these principles by providing a remedy for “unduly discriminatory or preferential” rates or contracts,[18] empowers the Federal Power Commission to consider them in determining whether a utility’s unregulated transactions have any prejudicial effects upon the jurisdictional rate structure.[19] The Supreme Court has stated, in a somewhat similar context, that where a public utility has agreed by contract to a rate affording it less than a fair rate of return, the proper concern of the Federal Power Commission is not whether to relieve it of its improvident bargain but to determine “whether the rate is so low as to adversely affect the public interest — as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.”[20] Similarly, the Louisiana Public Service Commission is not authorized to abrogate or modify a pipeline company’s direct industrial sale contract under La.R.S. 45:303, but it is fully empowered to protect the public interest by adjusting regulated rates to remove the prejudicial effects caused by a contractual rate that is unduly discriminatory.
In exercising this authority, the Commission should consider carefully whether the circumstances, rights and privileges of the parties are sufficiently similar to make the distinction in rates an “undue” one.[21] For example, if one rate was established in good faith by an arm’s-length contract, while another rate was fixed by a regulatory agency, a slight difference between the two reasonably could be regarded as a tolerable, rather than an undue, disparity; or, if the difference is more than slight, there may still be partial or total justification for the differential due to a difference in the cost of the service rendered.[22] In determining the issue of undue discrimination, the Commission should apply the rule of reasonableness in light of all the circumstances.[23]
In the instant case the Commission did not address the question of whether the disparity between the rates under consideration was based upon a reasonable classification. Nor does it appear that the Commission adverted to whether the discrimination could be regarded as tolerable, rather than undue, because of the different circumstances surrounding the fixing of the rates. La.R.S. 45:303 appears to require adequate consideration of all such relevant factors in determining whether a rate adjustment is warranted. Therefore, we conclude the Commission exceeded the bounds of its discretion by making an adjustment in rates without a prior sound determination of the existence of an undue discrimination having prejudicial effects upon the rates under its jurisdiction.
Assuming, without deciding, that an unduly discriminatory inequality exists between the rate on sales of natural gas to the cities and the rate charged on sales to Sugar Bowl’s industrial customers, the next *1020 question to be answered is whether the Commission made a reasonable adjustment in the cities’ rate. The statute authorizes the Commission, after a hearing, to adjust the rates charged under its jurisdiction “as may be necessary to remove the prejudicial effect of such rate of such direct industrial sale.” La.R.S. 45:303. The statute does not set forth a procedure for making the adjustment or state how this remedial device should be employed in relation to other facets of the regulatory process.
Although federal applications of similar statutory provisions provide some guidance, we have discovered no comprehensive rule designed to govern all possible situations. The Supreme Court’s opinion in Federal Power Commission v. Conway Corporation, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), indicates that the Federal Power Commission has latitude, at the very least, to put a utility’s wholesale electricity rates, which are within its jurisdiction, in the lower range of the zone of reasonableness, without concern that overall results will be impaired, where the utility has taken action to depress certain retail revenues, which are not within the Commission’s jurisdiction, in order to curb the retail competition of its wholesale customers. The Fifth Circuit Court of Appeals, in Georgia Power Company v. Federal Power Commission,[24] stated that the Federal Power Commission may deal with a utility’s unjust or discriminatory practice without the necessity of a full rate hearing; in that case, however, the utility failed to present any evidence to support its somewhat speculative claim of economic loss based on the anticipated conduct of its municipal customers. In perhaps the most comprehensive discussion of the question, the District of Columbia Circuit Court of Appeals, in Towns of Alexandria, Minn. v. Federal Power Commission,[25] construing the Federal Power Act, stated:
“The Act, while explicitly imposing upon the Commission a duty to rectify rate discrimination, is silent as to the point in the administrative process at which that obligation is to be discharged. We have not been referred to, nor have we found, either legislative history or judicial precedent bearing directly on the question. But as in the recent past we have declared, the Act’s ‘primary aim is the protection of consumers from excessive rates and charges,’ and certainly that wholesome purpose is best served by expeditious resolution of rate-discrimination claims. Moreover, as the Commission acknowledges, it has had past occasion to hold that patent discrimination may be removed without awaiting the outcome of a full-blown rate investigation. We perceive no obstacle to that course when the discrimination issue is discrete and the administrative record is sufficiently developed to enable a sound determination.” [footnotes omitted] 555 F.2d at 1029.
Nevertheless, in that case, where the question of a utility’s just and reasonable rate of return could not be separated practicably from the question of discrimination, the Court held that the Federal Power Commission properly refused to adjudicate the discrimination claim without the completion of an adequate record to decide also what rates would be compensatory.
As its federal counterpart, La.R.S. 45:303 is designed to protect consumers from excessive rates and charges through the expeditious resolution of rate discrimination claims. Nevertheless, the Commission, as in wielding its power in other areas, must act reasonably,[26] and with due regard to its fundamental duty to fix “just and reasonable rates.” La.R.S. 45:1176; cf. La.R.S. 45:302. Accordingly, in some cases it may be proper for the Commission to remove patent discrimination without conducting *1021 hearings regarding the effect of such an adjustment on the company’s rate of return. In other instances, however, depending on such factors as the nature of the discrimination and the magnitude of the proposed adjustment, it may be unreasonable for the Commission to take remedial action without a thorough assessment of the probable impact of the adjustment.
The record in the proceedings now under consideration reflects that Sugar Bowl did not intentionally or recklessly bring about the alleged undue discrimination. In its opinion the Commission implied that the company displayed irresponsibility in obligating itself to deliver such huge volumes of gas under the long term industrial contracts, and it further insinuated that transactions between the company and its corporate affiliates were less than arm’s length contracts. However, the evidence does not support these conclusions. There is no evidence in the record that Sugar Bowl intended to grant preferential treatment in any of its contracts. To charge the company with foresight of the present national energy shortage in the 1960’s would set a standard of acuity that could be met by very few, if any, in the natural gas industry, according to the record before us. Consequently, it would not be reasonable to conclude, on the present record, that Sugar Bowl intentionally or recklessly established discriminatory rates or practices in the same manner as the utilities in the federal cases compared. Moreover, the instant case may be further distinguished from Georgia Power Company v. Federal Power Commission, supra, in which the agency was not required to conduct a rate hearing, because here the Public Service Commission refused to allow the introduction by Sugar Bowl of any evidence showing the ramifications of the proposed adjustment relative to its rate of return. From our review of such evidence which was later admitted by the district court it would appear that Sugar Bowl’s claim, that its rate of return will not be reasonable after the Commission’s adjustment, is not mere speculation nor an issue which fairly can be characterized as discrete or separable.
Under the circumstances of this case the Commission was not justified in implementing its proposed rate adjustment without first determining the probable effect it would have on the company’s rate of return.
In addition to the basic flaws in the administrative proceedings which we have discussed thus far, there are other areas of concern that should be pointed to in an effort to guide the Commission in any future proceedings in this case.
La.R.S. 45:303 contains additional limitations on the authority of the Commission which are not found in the other regulatory statutes we have examined. The Commission is only authorized to adjust rates “as may be necessary to remove the prejudicial effect” caused by “any particular direct industrial sale.” La.R.S. 45:303. This language indicates that the Commission must determine the nature and extent of prejudice caused jurisdictional rates or ratepayers by specific industrial sales, and it implies that the adjustment must be designed to reduce the regulated rate only so far as is necessary to remove the prejudice or injury.
The Commission did not identify the particular direct industrial sales which constituted undue discrimination. Nor did it explain how it determined the causal connection between the preferential sales and the prejudice to jurisdictional rates, or how it arrived at the amount of such prejudice. It would appear essential to a proper judicial review of the Commission’s adjustment of rates under the statute that its findings pertaining to undue discrimination, causal connection between the discrimination and prejudice to rates, and the amount of the prejudice to rates be supported with fully articulated reasons as well as with sufficient evidence.
In addition to distributing gas to industries and cities, Sugar Bowl sells gas directly to 10,000 individual residents who do not receive service from any of the cities. Apparently, none of the residents were par *1022 ties to the appeals in this case, and no pleadings or briefs have been filed in their behalf in this Court. However, it appears from the arguments on file that Sugar Bowl’s sales to them are subject to the jurisdiction of the Commission. Therefore, we note that because of those residential customers one additional circumstance should be taken into consideration by the Commission before making any adjustment to the cities’ rates, and that is whether any adjustment is necessary in order to avoid undue discrimination between the city and rural residential consumers.
This case presents for our review only the merits of the preliminary injunction issued by the district court. In order to affirm the district court’s action we must find that there is a reasonable possibility that Sugar Bowl would ultimately prevail on the merits of the case and, that in the absence of injunctive relief, it would suffer irreparable injury. Central Louisiana Telephone Co. v. Louisiana Public Service Commission, 262 La. 819, 264 So.2d 905 (1972). For the reasons expressed herein we believe that more than ample grounds exist for both findings and that the district court did not abuse its sound discretion. Because of the posture of the case we may do no more than affirm the lower court’s judgment. However, due to the insufficiency of the record in many respects and due to the fact that our newly enunciated principles of law were not available to the Commission in the initial proceedings, it would appear to be preferable for the district court to vacate the Commission’s order and remand the case for further proceedings in the light of our opinion herein.
The judgment of the district court is affirmed at relator’s cost.
DIXON, J., dissents.
CALOGERO, J., dissents and assigns reasons.

. These customers included the municipalities of Plaquemine, Thibodaux, Donaldsonville, White Castle, Iberville Parish, and public systems named Polaris and Polaris (Killona).

. Under the terms of the Natural Resources and Energy Act of 1973, La.R.S. 30:501 et seq., certain contracts with the direct industrial users entered into after December 8, 1973 would ostensibly be subject to regulation by the Division of Natural Resources and Energy in the State Department of Conservation. See, La.R.S. 30:591 et seq.

. The record indicates that the Iberville Parish Gas District intervened in the proceedings.

. The Commission’s order, in pertinent part, provided:
“Accordingly, the Commission’s orders insofar as they regulate the price of sales by Sugar Bowl to city gate customers are amended and modified so that the price charged shall be calculated on the basis of the average price per MCF paid by Sugar Bowl to pre-April 1972 suppliers which continue to supply natural gas up to the comparable consumption during the twelve months preceding April 1972. For any additional gas taken by jurisdictional customers in excess of pre-1972 usage, Sugar Bowl shall charge the average price per MCF for natural gas purchased under supply contracts entered into subsequent to April 1972; provided that the total charge shall not exceed the average MCF price paid by Sugar Bowl for all gas purchased during the billing period.”

.Id.

. The increases were as follows: Sugar Bowl, from 25 cents MCF to $1.45 MCF; Louisiana Intrastate Gas, from 29 cents MCF to $1.08 MCF; Monterey Pipeline, from 25 cents MCF in June, 1973 to $1.03 MCF.

. Paragraph 4 of La.R.S. 45:303 provides:
“The commission has no jurisdiction over direct industrial sales by such public utilities unless after investigation the commission shall find that any particular direct industrial sale is prima facie prejudicial to the rates charged for natural gas sold to local distributing systems for resale, in which event the commission has authority after a hearing on the matter to order such adjustment in the rates charged for gas sold to local distributing systems for resale, as may be necessary to remove the prejudicial effect of such rate of such direct industrial sale.”

.Paragraph 3 of La.R.S. 45:303 provides:
“Whenever the commission is required in administering the provisions of this Part to find the value of gas in the field where produced, that value shall be determined at the amount paid therefor by the pipe line company in the field pursuant to arm’s-length contract; and in the absence of such arm’s-length contracts, the fair market value of the gas as a commodity in the field.”

. See, La.R.S. 45:301.

. 15 U.S.C. § 717c(b).

. 15 U.S.C. § 717d(a).

. Sugar Bowl contends that the statutory authority to make such adjustments is qualified by the last paragraph of La.R.S. 45:303 which provides as follows:
“The power and authority conferred by this Section shall not apply to the transportation or sale of natural gas to direct industrial consumers by such utilities but shall, in respect of such transportation or sale, be restricted to the determination by the commission of the cost of service properly allocable to such transportation or sale and to the allocation of the cost to that service.”
As enacted by the legislature in Act No. 373 of 1946, this provision was clearly not intended as a restriction ón the powers of the Commission to adjudicate discrimination claims. Rather, it deals with the separation procedures used in fixing rates for the jurisdictional sales.

. Bonbright, at 369 (1961).

. Priest, at 301.

. Priest, at 301.

. Priest, at 302.

. Hicks v. City of Monroe Utilities Comm., 237 La. 848, 876, 112 So.2d 635, 645 (1959). See also, State ex rel Guste v. Council of City of New Orleans, 309 So.2d 290 (La.1975).

. 16 U.S.C. § 824e(a).

. Federal Power Commission v. Conway Corporation, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). In litigation under the Natural Gas Act, which contains similar provisions, 15 U.S.C. §§ 717c and d, the Supreme Court has stated that consideration of the relationship between jurisdictional and non-jurisdictional rates is proper in fixing rates for jurisdictional sales. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed.2d 1241 (1945); cf. Colorado Interstate Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed.2d 1206 (1945).

. Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 373, 100 L.Ed. 388, 395 (1956).

. Cf. Hicks v. City of Monroe Utilities Comm., 237 La. 848, 876, 112 So.2d 635, 645 (1959).

. See, Cities of Batavia et al. v. Federal Power Commission, 179 U.S.App.D.C. 101, 548 F.2d 1056 (1977) which suggests such a justification would exist for a disparity between rates on sales of electricity to cities which take their peak at the same time as the system peak load, and the rate on sales to industrials which take their peak load at times different from the system peak.

. Priest, supra, at 302.

. 373 F.2d 485 (5th Cir. 1967).

. 555 F.2d 1020, 1029 (D.C.Cir. 1977).

. See, e. g., Louisiana Oilfield Carriers Association, Inc. v. Louisiana Public Service Commission, 281 So.2d 698 (La.1973); Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Commission, 244 La. 909, 155 So.2d 15 (1963); Louisiana Power & Light Co. v. Louisiana Public Service Commission, 256 La. 656, 237 So.2d 673 (1970).