hWOODARD, Judge.
Liberty Rice Mill, Inc., sued the defendants, claiming it was the victim of an unreasonable and discriminatory electric utility rate increase. The trial court found for the defendants, and Liberty appeals the decision. We affirm.
FACTS
These legal proceedings stem from the adoption of an ordinance, on February 28, 1989, by the Mayor and the Board of Aider-men of the City of Kaplan, which changed the electric utility rate structure of Liberty Rice Mill. Prior to that enactment, Liberty and Garan, Inc., a local garment manufacturer, were in the same classification and paid the same 8.7 cents per kilowatt hour rate. The 1989 ordinance reduced Garan’s rate from 8.7 to 8.0 cents, while simultaneously increasing Liberty’s from 8.7 to 9.4 cents.
Liberty filed a petition for a declaratory judgment on April 29, 1992, later amending it to include a demand for damages, and named as defendants the City of Kaplan, its Mayor, and its Board of Aldermen, individually and in their official |2capacity. Liberty alleged that the 0.7 cents rate increase to it coupled with the 0.7 cents decrease to Garan was unreasonable and discriminatory. The requested monetary damages are the total amount of extra electric utility cost Liberty has paid since the ordinance was adopted.
The parties stipulated as to the facts in the case, and the matter was tried March 2-3, 1995. The trial judge issued his reasons for ruling April 20, 1995, finding that Liberty had not been the subject of unreasonable discrimination. Liberty appeals that decision, asserting that the trial court should have found that the increase in its utility rate was unreasonably discriminatory and should have awarded damages.
LAW & DISCUSSION
Liberty asserts that the classification and rate schedule imposed through Ordinance No. 1 of 1989, which subdivided the prior Large General Service classification into three categories based on the number of employees, is unreasonable and discriminatory. Evidence was adduced in proceedings below that showed that although the cost to deliver electricity to Liberty is about the same as the cost of delivering electricity to Garan, Liberty has to pay for its electricity at a higher rate (17.5% higher) than Garan. No one really disputes this. The defendants do point out, though, that Liberty really received an overall reduction in its cost of electricity by the reclassification, when the removal of additional “demand” or “load” charges is factored in. Liberty’s decrease is just not as large as Garan’s. Notwithstanding, that does not change the gravamen of Liberty’s complaint, which is that its rate change is unreasonably discriminatory.
The evidence in the record also makes it clear that the reason the rates were restructured is that Garan, one of the largest employers in the City of Kaplan, threatened to relocate if its rates were not reduced. The defendants were naturally very concerned about the effect the closing of a large employer, like Garan’s, in Kaplan would have on the small community. Nonetheless, when Liberty asked for the same consideration given Garan, the defendants refused, stating that the city could not afford the loss of revenue that would result if it gave both the same rate.
The heart of the issue for this court to decide is, very simply put, can the city structure its rates for such reasons? The district court in a well-reasoned, well-written opinion concluded that it could. We affirm.
_jjA special difficulty for a court in the area of municipal utility rate fixing is that there is no statutory or administrative law scheme and very little jurisprudence on the subject of municipal utility rate discrimination, and no case on point. The leading Louisiana case is Hicks v. City of Monroe Utilities Commission, 237 La. 848, 112 So.2d 635 (1959). The *397 issue in Hicks was whether the city could charge more for water to customers outside the city limits who took water services only than it did to customers also outside the city who took both water and electricity services. In deciding that it could not, the court in Hicks articulated the principles which guide appellate review analysis of cases in this area of the law.
A municipal corporation has two classes of powers, one public and the other private in character. Id. In its private or proprietary functions, it is held to the same responsibility as is a private corporation. Id. As a utility provider, it is acting in its private or proprietary role, and one of its principal obligations in that capacity is the same as a private utility corporation: to serve its customers at a reasonable and nondiscriminatory rate. Id. Although obligated to maintain a uniform and nondiscriminatory rate among its customers, a municipal corporation operating a public utility nevertheless has the right to make a reasonable classification of its customers, and to charge a different rate according to the classification, based upon such factors as the cost of the service, the purpose for which the service is received, the quantity or amount received, the different character of the service provided, the time of its use, or any other matter which presents a substantial difference as a ground of distinction. Id. The mere fact that various classes of users are charged different rates is not in and of itself sufficient to constitute unjust discrimination. Id. It is not enough that the rate structure between the classes is discriminatory; it must be unreasonably discriminatory in light of the factors cited above. Id.
The court in Hicks held that making the water rates for customers not subscribing to the city’s electricity services four times higher (in our case, it is 17.5%) than those customers subscribing to both water and electricity services was unreasonable, capricious, arbitrary, oppressive, and discriminatory, and the rate could not be sustained since the basis for the classification was entirely collateral to and unconnected with the particular service being provided. Id.
Defendants’ position is that structuring rates with the goal of the retaining jobs and promoting economic development constitutes “any other matter which presents |4a substantial difference as a ground of distinction” under the Hicks standard and is a proper and reasonable consideration. Plaintiff argues that the only consideration should be the “historical, proven standards for electrical rate fixing ... cost of service provided and quantity of customer’s use_” Liberty also seems to be laboring under the impression that municipalities are held to the same administrative rules and regulations and procedures as the Public Service Commission. It cites no authority for its belief, and we are at a loss to justify it, were we disposed to do so, nor does it provide evidence demonstrating that defendants’ position is baseless or bogus. We point out that Liberty had a trial of the matter, in which it had the right and opportunity to present any and all the admissible evidence it wanted to and to establish whatever record it deemed necessary, as it would have were this before the Public Service Commission, whose decision would have been reviewable by a district court.
The trial judge in his reasons for ruling cited cases from other states which have held that classifications based on factors other than the cost of providing the services are nevertheless reasonable when they are to advance economic development or to encourage “large use” customers to locate and remain in the community. [See Re: Promotional Practices of Electric and Gas Utilities, 65 PUR 3d 405, 414 (Conn.P.U.C.); Re: Arkansas Power & Light Company, Docket No. 90-203-TF, 120 PUR 4th 139, 1990 WL 488969 (1990); Re: Stamford Water Company, (Conn.P.U.C.) 125 PUR 4th 339, 1991 WL 501770 (1991) ]. The underlying public policy rationale for approving discounted rates to certain customers apparently is that eventually the entire community and all utility customers will benefit because ■ of the effect that the preferential treatment has on attracting and retaining industry in the community.
That the Louisiana State Legislature has empowered the Public Service Commission to *398 provide special utility rates for certain depressed energy-intensive industries is also persuasive and informs our resolution of this case. La.R.S. 45:1163.2. The stated legislative purpose for this authorization, La.R.S. 45:1163.2(A), clearly suggests to us that the retention of jobs and the promotion of economic development are valid considerations also when municipalities structure rates:
The legislature finds and declares that it is essential to the continued growth and development of the state and to the continued employment, prosperity, and welfare of the people of the state that such depressed |5energy-intensive industries ... be encouraged to remain in operation.... It is the purpose of this Section to encourage the retention of such industries, and the substantial number of jobs that they provide, by requiring the establishment of a rate structure for the provision of electric service....
We do not reference the preceding in order to claim that it directly and categorically disposes of the issue. As we stated earlier, nothing seems to precisely cover the case before us. We do believe, however, that if an administrative agency can be legislatively mandated to consider economic factors for certain “public good” purposes, then a legislative body itself (the Kaplan Board of Aider-men), acting in concert with the city’s chief executive officer (the Mayor), is also able to do so.
Besides the cases from other jurisdictions and persuasive Public Service Commission statutory policy, evidence was also introduced into the record of the proceedings below that showed that private and public utilities in Louisiana have introduced economic development rates and “job creation and incentive” schedules, which again suggests that job creation, job retention, and the promotion of economic development are all proper elements to be considered by the municipal authority when exercising its discretionary rate-making powers.
The regulation of public utility rates rests solely with the agency or political subdivision of the state vested with the authority to supervise the operation of the utility, subject to judicial review of the reasonableness of the regulation. State ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290 (La.1975). A classification and a rate schedule made for the purpose of keeping in the community industries that employ a large number of persons is not “unreasonable.” There may have been other, “better” schemes, but that is neither the issue nor the standard by which a municipal’s actions in this area are judged. The action by the city need only be reasonable. The scheme enacted in this case is reasonable and understandable — even laudatory in the sense that it is the expression of the hope that the entire community will benefit and prosper. We certainly cannot hold that a rate disparity of 17.5% between two classes, and in which the complaining party’s total cost of services has actually gone down, is unreasonable, capricious, arbitrary, oppressive, and discriminatory, as contemplated by Hicks and its progeny.
Thus, the rate structure set forth in Ordinance No. 1 of 1989 is not unlawful, and we affirm the trial court.
I (¡CONCLUSION
For the reasons given in this opinion, the judgment of the trial court' is affirmed. Plaintiff is cast with all costs of this appeal.
AFFIRMED.