Dear Mr. Austin:
You requested the opinion of this office concerning whether a municipality may use utility funds to subsidize its general operations such that a significant transfer of utility revenues to a municipalitys' general fund constitutes an illegal tax.
Municipal corporations are given the power to construct, acquire, extend, or improve any revenue producing public utility and property necessary thereto, either within or without its boundaries, and may operate and maintain the utility in the interest of the public. R.S.33:4162. "Revenue producing public utility" is defined in R.S. 33:4161
to mean any revenue producing business or organization which regularly supplies the public with a commodity or service, including electricity, gas, water, ice, ferries, warehouses, docks, wharves, terminals, airports, transportation, telephone, telegraph, radio, television, drainage, sewerage, garbage disposal and other like services . . .
Municipal corporations are authorized to sell and distribute the commodity or service of the public utility within or without its corporate limits and may establish rates, rules, and regulations with respect to the sale and distribution. R.S. 33:4163.
In Liberty Rice Mill, Inc. v. City of Kaplan, 95-1656 (La.App. 3 Cir. 5/8/96), 674 So.2d 395, the court found that a city ordinance which changed the electric rate structure of the plaintiff and decreased the rates for another customer in the same classification was not unreasonable and impermissibly discriminatory. In discussing the ability of a municipal corporation to set utility rates, the court followed Hicksv. City of Monroe Utils. Comm'n, 112 So.2d 635 (1959), with regard to the obligation of a municipal corporation, acting in its proprietary role, to serve customers at a reasonable and non-discriminatory rate, and stated in pertinent part as follows:
 "A special difficulty for a court in the area of municipal utility rate fixing is that there is no statutory or administrative law scheme and very little jurisprudence on the subject of municipal utility rate discrimination, and no case on point. The leading Louisiana case is Hicks v. City of Monroe Utilities Commission, 237 La. 848, 112 So.2d 635 (1959). The issue in Hicks was whether the city could charge more for water to customers outside the city limits who took water services only than it did to customers also outside the city who took both water and electricity services. In deciding that it could not, the court in Hicks articulated the principles which guide appellate review analysis of cases in this area of the law.
 A municipal corporation has two classes of powers, one public and the other private in character. Id. In its private or proprietary functions, it is held to the same responsibility as is a private corporation. Id. As a utility provider, it is acting in its private or proprietary role, and one of its principal obligations in that capacity is the same as a private utility corporation: to serve its customers at a reasonable and nondis-criminatory rate. Id. Although obligated to maintain a uniform and nondiscriminatory rate among its customers, a municipal corporation operating a public utility nevertheless has the right to make a reasonable classification of its customers, and to charge a different rate according to the classification, based upon such factors as the cost of the service, the purpose for which the service is received, the quantity or amount received, the different character of the service provided, the time of its use, or any other matter which presents a substantial difference as a ground of distinction. Id. The mere fact that various classes of users are charged different rates is not in and of itself sufficient to constitute unjust discrimination. Id. It is not enough that the rate structure between the classes is discriminatory; it must be unreasonably discriminatory in light of the factors cited above. Id.
 The regulation of public utility rates rests solely with the agency or political subdivision of the state vested with the authority to supervise the operation of the utility, subject to judicial review of the reasonableness of the regulation. State ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290 (La. 1975) . . . There may have been other, "better" schemes, but that is neither the issue nor the standard by which a municipal's actions in this area are judged. The action by the city need only be reasonable . . ." (Emphasis added)
In Village of Albany v. Greater Livingston Waterworks Co., 193 So.2d 110
(La.App. 1st Cir. 1966), the court held that a municipality can regulate rates on the system it owns or leases and that there was no statutory provision for municipal rate regulation.
In Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 100 So. 710 (1924), the court determined that the right to govern and control a local public service utility and to establish and enforce rates for the services rendered by such utility was vested by its charter in the municipality and not the Public Service Commission. The court discussed the rate-making power of a municipality, in pertinent part as follows:
 "It is conceded on well-recognized authority that the rate-making power, whether exercised by agreement or by the fiat of law, is within the police power of the state as one of the state's highest attributes of sovereignty, and that this power can never be abridged nor irrevocably surrendered where there is, as in this state, constitutional inhibition. But equally well settled is the doctrine that the sovereign may, either expressly or by reasonable implication, delegate to a municipal corporation or to some subordinate board or commission, the lawful exercise of the police power within the boundaries of such municipality, board, or commission.
 Section 4, art. 6, of the Constitution of 1921, provides that the Public Service Commission shall have and exercise all necessary power and authority to supervise, govern, regulate, and control all waterworks and other public utilities, and to fix reasonable and just rates, fares, tolls, or charges for the services rendered by such public utilities, except as otherwise provided in the Constitution. The proviso or exception is to be found in section 7 of the same article 6; and it declares that nothing in this article shall affect the powers of supervision, regulation, and control over any waterworks or other local public utility now vested in any town, city, or parish government, unless and until, at an election to be held, a majority to the qualified electors in such town, city, or parish voting thereon shall vote to surrender such powers.
 It is to be observed that the last above mentioned section makes no reference to the power to make rates and charges. It is obvious, however, from the language used when taken in connection with section 4, that it was the intention and purpose of the framers of the Constitution to except and to exclude from the Public Service Commission the power to make rates to govern those local public service utilities which theretofore had been placed by law under the power, supervision, and control of the town, city, or parish government.
 In other words, it could not have been intended to allow the municipalities to retain control, supervision, and regulation of their public utilities, and to withhold from them the power to make rates, and to place that authority in the Public Service Commission. This was the construction placed on the qualifying section or proviso in the case of State v. City of New Orleans, 151 La. 24, 91 So. 537, wherein we said:
 `But our opinion is that the reservation of `the powers of supervision, regulation and control' was intended to include, and does include, the authority to fix rates.'
* * *
 So that, at least up to the Constitution of 1921, it was the settled jurisprudence of this state (and jurisprudence is law) that a municipal corporation had the implied power, as one of its incidental administrative and governmental functions, to supervise, regulate, and control the waterworks system and to enter into contracts to supply its inhabitants with water and to fix rates in such contract, and no express grant of power for that purpose was necessary in its charter, and it was common knowledge that all of the municipalities of the state having a waterworks system were exercising the power of supervision, control, and regulation over such waterworks system, and were making contracts and fixing rates therein . . ." (Emphasis added)
A similar provision in contained in Article IV, Section 21(C) of the current Louisiana Constitution, which states in pertinent part:
 The Public Service Commission does not have the power to regulate any public utility owned, operated, or regulated on the effective date of the 1974 Constitution by the governing authority of one or more political subdivisions, unless the electors approve such regulation in an election held for such purpose.
In City of Lake Charles v. Wallace, 247 La. 285, 170 So.2d 654 (1965), the validity of a City of Lake Charles ordinance imposing a service charge to defray the cost of garbage disposal and sanitation was challenged. On original hearing, the court found that the service charge was not a tax within the millage limits of the constitution. On rehearing, the court expanded its ruling and discussed R.S. 33:4163, in pertinent part as follows:
 "A state or one of its subdivisions frequently receives income from sources other than taxation, so that all forms of public revenue cannot with accuracy be called taxes. Thus, a city or town is frequently authorized to furnish some form of public service for profit, or at least for compensation. Such charges are not in any just sense taxes. Thus, it is well settled that the charges made upon consumers by municipal waterworks are not taxes, but merely the price paid for commodity sold. Nor may the following exactions be regarded as taxes: * * * a fee charged for * * * removing garbage. * * *" 51 Am.Jur.Taxation, Sec. 16, p. 48-49. (Emphasis added)
Based upon the foregoing, specifically that (i) municipalities are given the statutory authority to sell and distribute the commodity or service of public utilities, (ii) municipalities may establish rates, rules, and regulations with respect to the sale and distribution, and (iii) the charges made upon consumers by municipally owned utilities are not taxes, it is the opinion of this office that a significant transfer of utility revenues to a municipalitys' general fund, does not cause the monies received from the sale of the commodity to be a tax nor an illegal tax.
Trusting that this adequately responds to your request, we remain
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: ___________________________ MARTHA S. HESS Assistant Attorney General
RPI:MSH:jv
Date Released: October 15, 2002