578 So.2d 949 (1991)
ALLIANCE FOR AFFORDABLE ENERGY, INC., et al.,
v.
The COUNCIL OF the CITY OF NEW ORLEANS.
Lambert BOISSIERE, JR., et al.,
v.
James M. CAIN, et al.
NEW ORLEANS PUBLIC SERVICE INC.,
v.
The COUNCIL OF the CITY OF NEW ORLEANS, et al.
Nos. 90-CA-0420, 90-CA-0421 and 90-CA-0422.
Court of Appeal of Louisiana, Fourth Circuit.
April 4, 1991.
Rehearing Denied May 23, 1991.
*953 Joseph Bernstein, New Orleans, for appellants, Alliance for Affordable Energy, Inc., Citizens for Safe Energy, Inc., and Gary L. Groesch.
Herschel L. Abbott, Jr., Warren M. Schultz, Jr., David G. Radlauer, Edward H. Bergin, and Scott D. Wilson, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, and Thomas O. Lind, New Orleans, for appellant, New Orleans Public Service Inc.
Okla Jones, II, City Atty., Bruce E. Naccari, Asst. City Atty., Michael W. Tifft, Deputy City Atty., Kenneth M. Carter, Sidney H. Cates, IV, Carter & Cates, New Orleans, Clinton A. Vince, Bernhardt K. Wruble, John S. Moot, Verner, Liipfert, Bernhard, McPherson and Hand, Washington, D.C., and Walter J. Wilkerson, Wilkerson, Henry & Perez, New Orleans, for appellee, Council of the City of New Orleans.
Before ARMSTRONG, PLOTKIN and BECKER, JJ.
PLOTKIN, Judge.
These two consolidated appeals present complex state and federal questions. The ultimate questions are: (1) whether New Orleans Public Service, Inc. (NOPSI) acted prudently or imprudently in its oversight and management of its participation in the construction project of the Grand Gulf I nuclear power plant, and (2) who should bear the excessive cost overruns of this project, the ratepayers/consumers of New Orleans or the stockholders of NOPSI.
New Orleans Public Service and the Alliance for Affordable Energy (Alliance) have each appealed the rate order decided by the New Orleans City Council (Council) on February 4, 1988, and its Reasons For Judgment, entitled "Prudence Investigation: Determinations and Order Regarding the Prudence of the Management of New Orleans Public Service, Inc. With Respect to Grand Gulf I." The rate order decision was affirmed by the civil district court of the Parish of Orleans.
The New Orleans City Council is the ratemaking body for the City of New Orleans. Under the City's Home Rule Charter, Section 4-1604, the Council is invested with "all powers of supervision, regulation and control over any" public utility within the City. The authority of the Home Rule Charter is recognized by the Louisiana Constitution, Art. 6, Section 5(E).
The Council found that approximately 31% of these costs, or $476 million, had been imprudently incurred. After considering the financial effects of a prudence disallowance on NOPSI, the Council decided not to permit $135 million of these imprudently incurred costs to be passed on to the ratepayers of New Orleans.
NOPSI has appealed this decision, contending that all its Grand Gulf costs should be passed on to the ratepayers. The Alliance has also appealed, contending that the entire amount of costs found to be imprudent should be disallowed from pass-through to the ratepayers.
The History
This litigation has a long and convoluted history in both state and federal court. The history was most recently summarized as follows by the U.S. Fifth Circuit in NOPSI v. The Council of the City of New Orleans, 911 F.2d 993 (5th Cir.1990) (NOPSI IV):
NOPSI is a producer, wholesaler, and retailer of electricity, providing its retail services to the city of New Orleans.[1] Along with Arkansas Power and Light [AP & L], Mississippi Power and Light [MP & L], and Louisiana Power and Light [LP & L], it is a wholly owned operating subsidiary of Middle South Utilities, Inc. [now known as Entergy *954 Corporation]. MSU operates an integrated `power pool' in which NOPSI and the three other power companies transmit the electricity they produce to a central dispatch center, and each draws back the power it needs to meet customer demand.
Through the 1950's and into the 1960's, most of the MSU system's generating plants were fueled with oil or gas. In the late 1960's, MSU sought to meet projected increases in demand by adding coal-fired and nuclear energy powered generating plants. Originally, MSU planned for each of the power companies to construct one or more nuclear facilities. Mississippi Power and Light was charged with constructing two plants at Port Gibson, Mississippi, to be known as Grand Gulf 1 and 2. The Grand Gulf project quickly proved too burdensome for one company, however. MSU created another subsidiary, separate from the power companies, known as Middle South Energy, Inc.[2] [MSE, which is now known as Systems Energy Resources, Inc., or SERI] to finance, own, and operate the Grand Gulf plants. In 1974, MSE in turn contracted with the power companies to finance the project. The companies agreed to pay for the construction of the plants in exchange for the right to [purchase] their output. The estimated construction cost at that time was $1.2 billion.
As the project progressed, consumer demand for electric power proved to be much lower than MSU and the power companies had expected. At the same time, regulatory delays, enhanced construction requirements resulting from the Three Mile Island accident, and high inflation led to spiraling costs on the Grand Gulf project. As a result, MSE suspended construction of Grand Gulf 2, although it continued to build Grand Gulf
1. The cost of completing Grand Gulf 1 alone eventually exceeded $3 billion.[3]
911 F.2d at 995-96 (footnotes omitted).
In late 1979, before Grand Gulf I became operational and before its costs were known, NOPSI applied to the Council for a "capacity adjustment clause" which would authorize an automatic pass-through of future Grand Gulf construction costs to its ratepayers. In January 1980, nine months after the Three Mile Island accident, but before the Council acted on the application, NOPSI made a voluntary commitment to a 29.8% share of Grand Gulf, although its actual consumption need was approximately 9%. NOPSI failed to inform the Council of its commitment to the Grand Gulf project until 1980 when it applied for the pass-through of costs to the ratepayers. The Council held hearings in May and September 1980, but declined to adopt the capacity adjustment clause.
The power companies considered various methods to allocate the cost of Grand Gulf in light of these developments. In 1982, MSU filed a Unit Power Sales Agreement with the Federal Energy Regulatory Commission [FERC], which set out the shares of Grand Gulf 1 output each company was required to purchase in order to pay construction costs. Arkansas Power and Light, which had finished its own nuclear plants, was not obligated to purchase any Grand Gulf power. Louisiana Power and Light, which had not finished its plant, was obligated to purchase 38.57%. Mississippi Power and Light was obligated to purchase 31.63%, and NOPSI 29.8%. MSU also filed a new System Agreement with FERC, which set forth the terms and conditions for coordinated operations and wholesale transactions among the four companies, but did not deal with the Grand Gulf costs.

*955 FERC assigned the agreements to two separate Administrative Law Judges for the statutorily required task of determining whether they were just and reasonable. Both judges held that the failure to distribute the Grand Gulf costs among all the members rendered the agreements unduly discriminatory; ALJ Head further held that these costs should be allocated in proportion to each company's relative system demand. Middle South Services, Inc., 30 F.E.R.C. #63,030, pp. 65,170-65,173 (1985) (System Agreement); Middle South Energy, Inc., 26 F.E.R.C. #63,044, pp. XX-XXX-XX,108 (1984) (Unit Power Sales Agreement) (ALJ Head). FERC consolidated the proceedings for review, and determined that an adjustment of the shares allocated in the Unit Power Sales Agreement was all that was necessary to render both agreements just and reasonable. FERC reduced NOPSI's share from 29.8% to 17%.
911 F.2d at 996 (footnotes omitted). The FERC allocations were affirmed on rehearing. Mississippi Industries v. FERC, 808 F.2d 1525, modified on rehearing 822 F.2d 1104 (D.C.Cir.), cert. denied, 484 U.S. 985, 108 S.Ct. 500, 98 L.Ed.2d 499 (1987); City of New Orleans v. FERC, 875 F.2d 903 (D.C.Cir.1989), cert. denied sub nom. Mississippi v. FERC, ___ U.S. ___, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990).
After Grand Gulf became operational in July 1985, NOPSI filed an application with the Council to recover its construction and operating costs from the ratepayers, which would have resulted in an immediate 60% increase in retail utility rates. The Council denied an immediate rate increase, although it offered NOPSI interim rate relief. NOPSI rejected this offer and filed suit in federal court against the City, its mayor, and against the City Council collectively and its members individually. The district court dismissed the suit, holding that under the Johnson Act, 28 U.S.C.  1342, it lacked jurisdiction to proceed. The court further noted that if it did have jurisdiction, it would have abstained pursuant to Burford v. Sun Oil, Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The Fifth Circuit reversed, but then withdrew its original opinion and affirmed on rehearing, finding that abstention was proper under Burford and under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). NOPSI v. The City of New Orleans, 782 F.2d 1236, modified on rehearing, 798 F.2d 858 (5th Cir.1986) (NOPSI I.).
On October 10, 1985, the Council passed a resolution undertaking an investigation into the prudence of NOPSI's participation in the Grand Gulf project and the resulting costs incurred, as well as NOPSI's efforts to minimize such costs. NOPSI filed a second suit in federal district court, attempting to enjoin the Council from holding the hearings and preventing the pass-through of costs. The district court dismissed on grounds of ripeness, and in the alternative abstained. The Fifth Circuit affirmed on the issue of ripeness. NOPSI v. The Council of the City of New Orleans, 833 F.2d 583 (5th Cir.1987) (NOPSI II).
In March 1986, the Council entered into a partial settlement with NOPSI under which NOPSI agreed to absorb $51.2 million of the Grand Gulf costs, and the Council allowed NOPSI to phase in an interim rate increase, subject to the results of the Council's prudence investigation.
The Council held hearings on the question of prudence from March 4, 1986, through February 24, 1987. In addition, the Council accepted into the record prepared testimony, depositions and reports made by expert witnesses. In April 1987, the Council completed the record of its investigation and began deliberations, which NOPSI attempted to prevent by seeking an injunction from the federal district court. This request was later dropped by NOPSI.
The Council completed its extensive investigation and issued a final rate order on February 4, 1988. The investigation concluded that, at a minimum, NOPSI was imprudent in incurring approximately 31%, about $476 million, of Grand Gulf's $1.567 billion total costs to New Orleans, and that it had done virtually nothing to assess or minimize its risks. The rate order found *956 "that NOPSI's management failed to protect the interests of its ratepayers, and the company's conduct fell short of prudent utility management, to the detriment of its ratepayers and shareholders." Fearing that disallowance of the entire amount would force NOPSI into insolvency, the Council made a one-time imprudence deduction of $150 million, which, on the basis of further caution, it reduced to $135 million. The Council thus disallowed the pass-through of only $186.2 million (the $135 million disallowed as imprudent and the $51.2 million which NOPSI agreed not to pass through to retail rates in the partial settlement) of the imprudently incurred Grand Gulf costs to the ratepayers, and allowed the remainder of these imprudently incurred costs (approximately $290 million) to be passed on to the ratepayers.
NOPSI then filed complaints against the rate order in state and federal court. In federal district court, NOPSI argued that the Council could not prevent the pass-through of any Grand Gulf costs because this issue was preempted by federal law under Nantahala Power and Light Co. v. Thornburg, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). The district court abstained under Burford and Younger and the Fifth Circuit affirmed its abstention. NOPSI v. Council of New Orleans, 850 F.2d 1069 (5th Cir.1988), cert. granted, 488 U.S. 1003, 109 S.Ct. 780, 102 L.Ed.2d 772 (1989). The Supreme Court reversed, finding abstention improper on both grounds, but holding that the Council's actions were not preempted by federal law. NOPSI v. Council of City of New Orleans, 491 U.S. 350, 109 S.Ct. 2506, 2517, 105 L.Ed.2d 298 (1989) (NOPSI III). On remand, NOPSI again argued that the Council's order was preempted on its face and that the Council was attacking the FERC allocation. The federal district court ruled that the order was not facially preempted, and stayed the pretext issue pending resolution of the litigation in the state courts. The Fifth Circuit affirmed. NOPSI v. Council of the City of New Orleans, 911 F.2d 993 (5th Cir.1990) (rehearing denied October 17, 1990) (NOPSI IV).
NOPSI appealed the Council's rate order in the Civil District Court of the Parish of Orleans. This state court action was filed by NOPSI simultaneously with its federal NOPSI III suit. NOPSI's appeal was consolidated with two other suits, one filed by the Council seeking a declaratory judgment on the validity of its rate order, and one by consumer advocates Alliance for Affordable Energy, Citizens for Safe Energy, and Gary L. Groesch, challenging the disallowance of only $135 million of the $476 million in costs that the Council had found to be imprudently incurred.
The district court upheld the rate order of the Council, affirmed its validity, and denied the petitions of both NOPSI and Alliance. The district court held that the rate order's findings were not preempted by federal law, and that its disallowance of imprudent costs was just and reasonable and supported by substantial evidence.

THE APPEAL OF NOPSI

The Issues Raised by NOPSI
The issues raised by NOPSI that are pertinent to our resolution of this case are as follows:
1. a. Did the district court apply the correct standard of review to the Council's findings of fact and conclusions of law?
b. Did the district court correctly allocate the burden of proof to the proper party?
c. Is there substantial evidence to support the Council's finding of imprudence on the part of NOPSI?
2. Is the Council's rate order preempted by federal law?
3. Is the Council's rate order a pretext for an impermissible collateral attack on the allocations made by FERC?
4. Did the Council's rate order violate the commerce clause of the U.S. Constitution (Art. I, sec. 8)?
5. Was NOPSI denied due process or meaningful judicial review by the Council when it utilized its legal and technical staff for the preparation of the rate order?

*957 1. The Sufficiency of the Evidence

a. Standard of Review
The Civil District Court of Orleans Parish is the proper court designated to review a City Council rate order regulating utility rates. New Orleans Home Rule Charter, Section 4-1604. Under the Louisiana Administrative Procedure Act, LSA-R.S. 49:964(G), the district court must affirm an agency decision, unless substantial rights of the appellant have been prejudiced because the administrative decision was:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion ...; or
(6) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record.
The City Council issued its rate order under the authority of the Louisiana Constitution, Art. VI, Section 5, and of its Home Rule Charter, Section 4-1604. The Council did not violate constitutional or statutory provisions or exceed its statutory authority. Its decision was made upon lawful procedure and was not affected by error of law.
NOPSI contends on appeal that the district court erred in applying the "arbitrary and capricious" standard of review. Generally, the "manifest error" test is used in reviewing the facts found by an agency and the "arbitrary and capricious" test is used in reviewing an agency's conclusions and exercises of discretion. Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1159 (La.1984).
The Civil District Court summarized its standard of review thus: to determine whether the facts "are supported by substantial evidence in the record and are rationally based." Slip opin. at 4. The court then cited the above section of the Louisiana Administrative Procedure Act. LSA-R.S. 49:964(G). The arbitrary and capricious standard is the same as that of rational basis. "Arbitrariness is the absence of a rational basis." Graffeo v. City of New Orleans, 351 So.2d 1311, 1314 (La. App. 4 Cir.1977).
The Louisiana Supreme Court has applied a standard of reasonableness to appellate review of utility rate decisions:
A reviewing court will not substitute its judgment for that of the [ratemaking body] in fixing public utility rates, and the agency's rate order will be upheld unless shown to be arbitrary, capricious, abusive of its authority, clearly erroneous or unsupported by evidence. See So. Cent. Bell Tel. v. L.P.S.C., 352 So.2d 964 (La.1977).
Cent. La. Elect. Co. v. La. P.U.C., 437 So.2d 278, 279 (La.1983).
The Louisiana Supreme Court has specifically articulated the standard of appellate review of Council rate decisions.
[T]he Council of the City of New Orleans is vested with the sole legal authority to regulate the rates charged by companies furnishing utility services in the city of New Orleans. Recognition of that authority requires that we limit our review to a determination of whether the [decision] is reasonable and refrain from merely substituting our judgment for that of the Council.
State ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290, 294 (La.1975), cited with approval, 491 U.S. 350, 109 S.Ct. 2506, 2520, 105 L.Ed.2d 298 (1989).
This court has reviewed the record to determine whether there is substantial evidence to support the facts found by the Council, and has applied a standard of reasonableness to review the Council's conclusions of law. The burden of proving that a rate order is arbitrary or unreasonable is on the party attacking the order. Dixie Elect. Mem. v. La. P.U.C., 441 So.2d 1208, 1210 (La.1983). Thus NOPSI must demonstrate that the Council's fact findings are not supported by substantial evidence and that its conclusions are unreasonable.

*958 b. Burden of Proof for Prudence
NOPSI contends that the trial court improperly found that the burden of proof was on NOPSI to show that its actions were not imprudent. NOPSI cited a footnote to the concurrence in Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission of Missouri, 262 U.S. 276, 289, n. 1, 43 S.Ct. 544, 549, n. 1, 67 L.Ed. 981 (1923) (Brandeis, J., concurring), which stated that "[e]very investment may be assumed to have been made in the exercise of reasonable judgment, unless the contrary is shown."
The trial court held that there was an initial presumption of prudence on the part of the utility, but that, once this presumption is rebutted, the burden of proof then shifted to the utility to prove the prudence of its expenses. In Minnesota Power & Light Co., 11 FERC 61,312, at 61,644-45 (1980) FERC held that the burden shifted at the point where serious doubt about the prudence of an expenditure arose.
A `doubt' is created if the challenge raises a question the answer to which is not arguably in favor of prudence. A doubt is `serious' if there appears at least a possibility that, upon due investigation, the answer to the question will lead to a finding against prudence.
New England Power Co., 27 FERC #63,037, at 65,157 (1984), rev'd on other grounds, 31 FERC # 61,047 (1985).
In the instant case, the trial court found that the burden of proof had shifted to NOPSI. Serious doubts concerning NOPSI's prudence were raised through testimony which established that NOPSI voluntarily accepted an excessive share of Grand Gulf even though it did no studies on Grand Gulf costs, that NOPSI could and should have sold at least part of its Grand Gulf power off system, and that NOPSI could and should have purchased coal fired power. The burden of proof then shifted from the Council to NOPSI, which then had to prove that its actions were not imprudent. The trial court found that NOPSI failed to meet this burden of proof. We agree with the trial court's legal analysis and find no merit to NOPSI's contention.
A working definition of the term "prudence" is helpful in the analysis of this issue. NOPSI proposed the following definition which was cited in the Council rate order: "whether the utility followed a course of conduct that a capably managed utility would have followed in light of existing and reasonably knowable circumstances." In re Seabrook Involvements by Maine Utilities, 67 P.U.R. 4th 161, 166 (Maine P.U.C., 1985). See Rate Order at 34. In the seminal words of Justice Brandeis, the prudence test "is applied for the purpose of excluding what might be found to be dishonest or obviously wasteful or imprudent expenditures." Missouri, supra, 43 S.Ct. at 549, n. 1.

c. The Sufficiency of the Evidence
The rate order of the Council incorporates the 224 page "Determinations and Order" as its formal findings of fact and conclusions. In this document, the Council, as decision-maker, specified in detail its reasons for making its ruling, including its factual findings and credibility decisions. This document was unanimously adopted by the Council as its final order and decision.
The findings of the Council, as stated in the rate order, are as follows:
1. In 1974 NOPSI made a commitment to an indeterminate share of Grand Gulf costs without limiting its liability.
2. The oversight and review by NOPSI management of its Grand Gulf involvement, especially during 1979-80, was uncritical, severely deficient, and less than prudent.
3. NOPSI management should have been aware of the escalation of nuclear power plant costs, especially after Three Mile Island in March 1979. Its 1980 commitment to a 29.8% share of Grand Gulf, a share which FERC later found to be excessive, was grossly imprudent.
4. NOPSI should have sold off system its share of Grand Gulf power over and above its 9% actual need. The share over and above the actual need should be *959 passed through in retail rates only at the cost level of coal fired power. This would result in an approximately 31% reduction in the amount of Grand Gulf costs which NOPSI could pass through to retail ratepayers.
5. Disallowance of the full amount of imprudently incurred costs could cause NOPSI to become insolvent. NOPSI could, however, withstand an imprudence disallowance of $150 million, which the Council chose to further reduce by ten percent to $135 million on the basis of caution.
6. There shall be no further disallowances for imprudence relating to the Grand Gulf project. The Council will consider future applications for rate relief based upon legitimate costs and applications for financing to fund operations. The Council assures debt and equity investors in NOPSI of the safety of their investments.
7. These findings are without prejudice to other pending litigation and may be reviewed in the event of a new wholesale cost allocation by FERC or significant change in financial conditions.
Rate Order at 9-13.
NOPSI does not question the first finding, that in 1974 it made an indeterminate commitment to purchase Grand Gulf power, the fifth finding, that the disallowance was reduced in the interest of NOPSI's financial situation, the sixth finding, that the Council will make no future disallowances for imprudence, and the seventh finding, that the findings are without prejudice to pending litigation and may be reviewed in the event of a significant change in financial conditions. These findings are not at issue before this Court.
In its appeal NOPSI challenges the second finding, that its management and oversight of Grand Gulf was deficient, the third finding, that it should have been aware of cost escalations in nuclear power plant construction, and the fourth finding, that it should have sold its high priced nuclear power off system and bought lower priced coal fired power instead, and that the difference in cost between the two should be disallowed from pass-through to the ratepayers. NOPSI frames its assignment of errors on appeal thus: that the Council failed to prove that it could or should have foreseen the escalation of costs of the Grand Gulf project, that it had an opportunity to sell off a portion of its share of Grand Gulf power, that it had an opportunity to buy coal fired power, and that a sell-off of nuclear power would have resulted in savings.
Extensive hearings were conducted by the Council in 1986 and 1987 on the issue of NOPSI's prudence in incurring liability for the costs of Grand Gulf. These hearings included submission of prepared testimony by and depositions of experts and cross-examination of witnesses by all parties.
i. The Foreseeability of and Failure to Monitor Cost Escalation
NOPSI has the burden to prove that it did monitor Grand Gulf costs in a prudent manner, and that cost escalation of the Grand Gulf project was not foreseeable.
The evidence in the record shows that NOPSI had no personnel and no organizational procedures for monitoring or reviewing information about Grand Gulf costs, or for investigating or challenging escalating costs.
Four members of the NOPSI Board of Directors testified that they could not recall that any studies were ever presented or discussed at NOPSI board meetings concerning the escalation of Grand Gulf construction costs, especially during the crucial years 1979-80 immediately following the Three Mile Island accident. This lack of study or discussion was confirmed by William Talbot, the secretary of NOPSI, on review of the minutes of the board meetings. NOPSI officials, including its president, James Cain, its senior vice president and general manager, Malcolm Hurstell, its senior vice president and treasurer, Malcolm McLetchie, its comptroller, John Chavanne, and its former comptroller, August Brodtmann, all testified that they did not recall any studies conducted by NOPSI concerning the escalation of construction costs for nuclear power or the alternative *960 sources of power which would reduce NOPSI's risk. NOPSI did, on the other hand, conduct studies during this period on issues such as internal computerization and its decision not to build the Alligator Point nuclear plant.
The evidence shows that NOPSI never held a meeting or commissioned a study to discuss the costs implications of the Three Mile Island accident in March 1979 for the Grand Gulf project. Instead NOPSI voluntarily acceded to purchase an excessively large share of Grand Gulf power in January 1980. This share, 29.8%, was disproportionate to the relative size of NOPSI in terms of its consumption within the MSU system which was 9%. In 1985 FERC found this share to be excessive and reduced it to 17%. At the same time, NOPSI did nothing to oppose the decision of another MSU company, AP & L, to take no share of Grand Gulf power. In addition, under the Availability Agreement, NOPSI was obligated to pay for its entire share of Grand Gulf whether the plant was operational or not.
NOPSI contends that it had no responsibility or obligation to monitor Grand Gulf costs, since it is part of the MSU system. Planning for the Grand Gulf project was accomplished through the MSU operating committee and MSE, with MP & L overseeing the actual construction. NOPSI claims that it was informed of cost developments through its president, James Cain, and its senior vice president, general manager, and representative on the MSU operating committee, Malcolm Hurstell. Cain admitted that no personnel at NOPSI were responsible for critical review or analysis of Grand Gulf cost estimates. Cain testified that he relied on Hurstell. Hurstell testified that he obtained his information from Cain, who informed him about the construction schedule for Grand Gulf, but only occasionally mentioned the costs. However, Hurstell admitted that, as a member of the MSU Operating Committee, he received information from various government and industry sources concerning cost escalation in nuclear power plant construction. Hurstell admitted that in January 1980 he had knowledge that the Grand Gulf cost increases could be open-ended. However, he chose to rely on other, lower, cost projections, and did not inform the NOPSI board about the possibility of higher costs.
In the 1980s, Cain was president of both NOPSI and LP & L. In addition, NOPSI and LP & L held joint board meetings. Hurstell testified that these two companies did not have identical interests during the critical period of Grand Gulf planning, that is, between 1979 and 1985. It may be inferred that NOPSI and AP & L also did not have identical interests, since AP & L tried to opt out of nuclear altogether, while NOPSI opted to take a very large share of nuclear power. Yet NOPSI did nothing to represent or safeguard its own interests over against the other MSU companies. NOPSI never convened any committee or Board meeting to discuss the impact of the escalation of Grand Gulf costs on NOPSI ratepayers. FERC eventually decided that the MSU allocations of Grand Gulf, giving 29.8% to NOPSI, the smallest company in the system, and exempting AP & L from any portion, were inequitable and improper.
Thus it was imprudent for NOPSI to rely on and acquiesce without objection in the decisions of the directors and operating committee of MSU without conducting any investigative studies concerning the impact of Grand Gulf costs on NOPSI and its ratepayers during the course of its decision making and oversight of NOPSI's involvement in the Grand Gulf project.
NOPSI now raises a "system defense," claiming that it had no responsibility to make independent studies or conduct discussions, since it was part of the MSU system which made decisions for the system as a whole. Although NOPSI now urges this system defense, the record is replete with tactical decisions by NOPSI to block inquiries by the Council into the circumstances of MSU during the critical period in question. NOPSI objected to and declined to permit discovery questions or requests for document production concerning the management of the other companies within MSU or the MSU system itself. On the other hand, NOPSI produced selective system documents, witnesses and evidence *961 to justify its own positions. Rate Order at 20-26. One example is NOPSI's refusal to allow its president, Cain, to answer questions during the hearings concerning consultations with officers or directors of other MSU companies or of MSU itself, despite the fact that Cain was president of two of those companies and a member of the MSU Board of Directors.
Since NOPSI refused to allow discovery of critical information concerning the MSU system and its other operating companies, while producing selective information for its own benefit, NOPSI cannot claim this defense as justification for its actions or for its failures to act. By its own pre-hearing and hearing conduct on this issue, NOPSI has waived this defense.
Moreover, as a result of NOPSI's blocking of the introduction of evidence relating to the MSU system, there is insufficient evidence in the record for this court to review NOPSI's system defense. NOPSI's own tactics have effectively prevented both the hearing agency and this court from examining the management, practices and policies of MSU and its other operating companies during the time period in question in order to ascertain whether NOPSI's conduct was in fact legitimately controlled by MSU. Therefore NOPSI cannot now claim its membership in the MSU system as a defense to its imprudence.
NOPSI further claimed that it had no responsibility to oversee costs since FERC would assign it reasonable rates. This disclaimer is contradicted by the U.S. Supreme Court which has held that "a utility's purchase of a particular quantity of high cost power at FERC-approved rates might be unreasonable, if lower cost power were available from another sources." NOPSI IV, 911 F.2d at 1000, citing Nantahala Power & Light Co. v. Thornburg, 476 U.S. at 972, 106 S.Ct. at 2360.
The Council found NOPSI imprudent for failing to do anything to reduce its financial risks in the light of the escalation of Grand Gulf construction costs. The Council made it clear that it was not challenging the share of Grand Gulf allocated by FERC, but rather NOPSI's negligent management and its failures to protect the interests of its ratepayers and its stockholders.
NOPSI also contends that the escalation in Grand Gulf costs was unforeseeable. However, by 1978, the projected construction costs of Grand Gulf had already doubled. After the disaster at Three Mile Island in March 1979, studies on the nuclear power industry, and specifically on the necessity for stricter safety standards, were being conducted across the United States. These studies were reported by the news media. The U.S. Congress held hearings on the subject. Some utility companies, including one member of the MSU system, AP & L, chose to opt out of nuclear power plant projects altogether. In 1980, MSU issued an Annual Report entitled "Nuclear Power in the Post-Three Mile Island Era." This report discussed the Three Mile Island accident, noting safety factors in nuclear power plant operation, medical risk factors, nuclear waste disposal problems, and other issues, but failed to disclose the impact on construction and operating costs. The report also clearly described the wisdom of diversification between nuclear and coal fired power. It is inconceivable that prudent utility management in NOPSI could have been unaware of the cost implications of Three Mile Island for nuclear power plant construction at this time.
NOPSI cites the decision in Mississippi Industries v. F.E.R.C., 808 F.2d 1525 (D.C. Cir.1987), in support of its contention that the cost escalation was unforeseeable. The D.C. Circuit stated: "[i]t seems unlikely that, in 1979, the companies could have foreseen that the cost of completing Grand Gulf would quadruple ..." Id. at 1555. However, the preceding sentence refers to that period in 1979 when negotiations were taking place in the MSU operating committee concerning the percentages of Grand Gulf that each company would take. As a result of these negotiations, AP & L took 11.11% and NOPSI 25.78%. Id. at 1533, and 1533, n. 25. By 1980, AP & L had withdrawn completely and NOPSI's share had been increased to 29.8%. NOPSI's citation *962 out of context of this statement by the D.C. Circuit does not constitute evidence that in late 1979, as well as 1980 and 1981, NOPSI could not have foreseen a substantial escalation in Grand Gulf costs.
NOPSI contends that the estimates of Grand Gulf costs which it received during this period were prepared for MSE by the Bechtel Corporation using the "engineering cost estimation" method. This method forecast minimal cost increases. NOPSI claims that this was the standard method used in the industry at the time. However, its general manager, Hurstell, admitted that other utilities commonly used an alternative method, regression analysis, for load forecasting in 1979.
The Council rate order relied on the regression analysis method used by witness Charles Komanoff. NOPSI claimed that this method was not used in the nuclear power industry in 1979. However, studies based on this method had been published as early as 1974 by researchers at Harvard Business School and M.I.T. In addition, studies using this method were published in 1978 by the Department of Energy and in 1979 by the Rand Corporation. NOPSI's complaint that the book of Charles Komanoff, a primary expert witness in the Council hearings, was not published until 1981, has no merit. The record shows that Komanoff had published the results of his analysis of nuclear plant capital cost trends in an article in a widely read industry journal in 1978, that drafts of his book were circulated in 1978-79, and that he testified using this method in publicly reported hearings before the House Interior Committee in 1979. The Council noted that the regression analysis method was a "widely accepted technique," which, in contrast to the method preferred by NOPSI, "utilized hard data from completed nuclear plants to measure the actual rates of increase in costs during the period and to produce estimates of the effects on costs of various causal factors." Rate Order at 135. NOPSI's critique of the Council's reliance on the regression analysis method has no merit.
Although NOPSI contends that the escalation of Grand Gulf costs was unforeseeable, especially during the period 1979-80, following the Three Mile Island catastrophe, NOPSI does not contest the fact that it appeared before the Council in May 1980, asking the Council to approve a "capacity adjustment clause," which would authorize the automatic pass-through to ratepayers of all Grand Gulf costs, whatever they turned out to be. This action indicates that NOPSI was sufficiently concerned about Grand Gulf costs in 1980 to petition the Council for a "blank check" to avoid the adverse impact of such costs on itself. NOPSI cannot now deny that it could have had any foreknowledge of the magnitude of Grand Gulf cost escalation.
We find substantial evidence to affirm the Council's findings on the issues of negligent management and the foreseeability of Grand Gulf costs.

ii. Off System Sales
The Council identified two positive steps not taken by NOPSI which a prudent manager could and should have taken: (1) that NOPSI could and in prudence should have sold part of its Grand Gulf allocation of nuclear power with its resulting construction costs off system to other utility companies, and (2) that NOPSI should have replaced this power with less expensive coal fired power. NOPSI carries the burden of proving that its failure to pursue off system sales of its Grand Gulf power was prudent.
NOPSI contends selling Grand Gulf power off system was impossible because there were no actual willing purchasers for its nuclear power. However, the president and CEO of NOPSI, James Cain, testified under oath before the City Council in 1980, when asking for an automatic pass through of Grand Gulf costs to the ratepayers of New Orleans, that the Council should not be concerned about the large share of Grand Gulf (29.8%) to which NOPSI had then just committed itself, because NOPSI could always sell part of its share to other companies. Cain stated that NOPSI would handle the costs derived from its Grand Gulf commitment either by *963 pass through to the ratepayers or by selling its capacity off system. Cain, 1980 Testimony to Council, at 50. He also stated that if, in the future, the Council became opposed to its Grand Gulf involvement, it would have the option of selling its share "to some other buyer." Id. at 43-44. Cain stated: "NOPSI has the option of selling this capacity and marketing it, which we think will be a very attractive commodity to other electric utilities." Id. at 30-31. Such a formal statement of the possibility of risk reduction by off system sales made by the chief executive officer of the company under oath before the ratemaking body constitutes convincing evidence and must be considered an admission that such sales were feasible at that time. NOPSI cannot now retract the statement and argue the opposite.
NOPSI's contention that structuring and legal problems would make off system sales impossible is contradicted by the evidence of the System Agreement and the offer of such power to 57 other utility companies in 1982. In addition, Regis Trumps, vice president for planning of Middle South Services and secretary of the MSU operating committee, testified that under the System Agreement the individual companies could sell power off system. In 1982 this agreement was amended to give other companies within the system the right of first refusal. Trumps also testified that AP & L, LP & L and MP & L all had wholesale customers for their excess power. He could not recall that NOPSI ever tried to sell off system. Malcolm Hurstell testified that he was aware of Cain's testimony to the Council in 1980 and also stated that NOPSI could have marketed Grand Gulf power in 1980. He stated that in 1982 MSU acted as agent for NOPSI and the other MSU companies in an attempt to sell their Grand Gulf power off system, but by then it was unmarketable.
In the light of the above evidence, NOPSI clearly has not carried its burden of proof to show that its failure to make off system sales of Grand Gulf power was prudent or that such sales were impossible.

iii. Purchase of Coal Fired Power
The Council found that NOPSI could and in prudence should have bought coal fired power, which was considerably cheaper than nuclear power. NOPSI has the burden to prove that it was prudent in not purchasing any coal fired power. If NOPSI had bought coal power, there would have been a significantly cheaper source of power available to the ratepayers of New Orleans.
NOPSI contends on appeal that it had no opportunity to buy coal fired power. However, Malcolm Hurstell testified that NOPSI did not attempt to buy any coal fired power during the 1979-80 period although coal fired power was available for sale from the Southern Company and AP & L. Arkansas Power and Light built two coal fired plants at this time: White Bluff and Independence (ISES). Other companies within MSU bought power from these plants. NOPSI admits that MP & L and AP & L had bought ownership interests in the coal fired power of ISES. Hurstell testified that he did not attend the meeting at MSU at the time when AP & L offered to sell power from ISES. Instead, Hurstell, the NOPSI representative, had given his proxy for that meeting to the representative from LP & L.
Thus the evidence shows that coal fired power was available for purchase during the period in question. NOPSI chose to rely entirely on high cost nuclear power and not to invest in lower cost coal fired power.
During this period in history, electric utility companies were moving away from dependence on oil and gas fired power. The oil embargo in 1974 taught the industry that it was risky to be dependent upon one source of energy. NOPSI, however, ignored industry studies urging diversification of nuclear power with coal fired power. Jack Lundberg testified concerning the kinds of studies that were done for other utilities. NOPSI could have done such studies but did not.
Expert testimony showed that regardless of the cost impact of Three Mile Island, coal fired power had become less expensive *964 than nuclear power from Grand Gulf. Moreover, the greatly increased costs of nuclear power plant construction in the aftermath of Three Mile Island, estimates of which ranged from ten percent to an open-ended number, should have alerted NOPSI managers that action was necessary to avoid excessive economic damage. The 25% adjustment suggested by Komanoff was reasonable within the context of what was known at the time and ultimately turned out to be too conservative.
NOPSI contends that purchase of coal fired power would not have reduced its Grand Gulf costs and that off system sales of Grand Gulf power would not have resulted in savings. The evidence in the record clearly shows that if NOPSI had both sold its Grand Gulf power off system and bought coal fired power to replace it, substantial cost savings would have resulted. These savings form the basis for the calculation of the quantum of the imprudence disallowance (see infra). NOPSI did not carry its burden of proving that its failure to buy coal fired power was prudent. Therefore it may not legally pass on its excessive and imprudent costs to its ratepayers.
We note that NOPSI contends that the Council did not prove that the ratepayers suffered any actual damages from its imprudence. In this contention, NOPSI is confusing tort law with public utility law. In tort law, the plaintiff must prove that he or she had incurred damages. In public utility law, on the other hand, the hearing agency determines whether the utility acted prudently, and, if it did not, the agency then enacts an order whereby the results of such imprudent action may not be passed on to the ratepayers. Thus, in public utility law, the agency decision in effect prevents the damages from occurring, by disallowing imprudently incurred costs from utility rates. Proof of damages is not an element that must be proven in a public utility rate disallowance case.[4]

d. Summary
The trial court found that the initial presumption of prudence had been rebutted and that NOPSI thus bore the burden of proving its prudence. NOPSI has failed to meet its burden of proof.
The trial court found that the Council relied on substantial evidence in its findings of fact and that its conclusions were not arbitrary and capricious, but rationally based.
This court affirms the findings and conclusions of the Council and the decision of the trial court. We find not only that substantial evidence in the record shows that NOPSI acted imprudently, but that the preponderance of the evidence would support the same conclusion.

2. Preemption

a. Facial Preemption
NOPSI contends on appeal that the Council's rate order is preempted by federal law. Under the Supremacy Clause of the U.S. Constitution, Congress has the power to preempt state law. U.S. Const., art. VI, cl. 2; N.W. Cent. Pipeline Corp. v. State Corp. Com'n of Kansas, 489 U.S. 493, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509 (1989).
For state action to be preempted, Congress must have expressed a clear intent to preempt state law, Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), or to occupy the field so completely as to leave no room for state law, Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Otherwise state action is preempted only when it actually conflicts with federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or is an obstacle to the accomplishment or execution of the purposes of Congress, Hines v. Davidowitz, 312 U.S. 52, *965 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See N. W. Cent. Pipeline, 109 S.Ct. at 1273.
NOPSI cites three of the above reasons to support its contention that federal law preempts the Council's rate order. First, it contends that Congress, in the Federal Power Act (FPA), intended to occupy the field. In the absence of explicit language in a statute declaring the intent to preempt, such intent may be inferred from the comprehensiveness of the legislation, and whether it leaves room for any state action in the field. N.W. Cent. Pipeline, 109 S.Ct. at 1273. The presumption is that the historical powers of the states have not been superceded by federal legislation unless that was the "clear and manifest purpose of Congress." Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 108 S.Ct. 1350, 1353, 99 L.Ed.2d 582 (1988), citing Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985). See also California v. ARC America Corp., 490 U.S. 93, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). Historically, "the regulation of utilities is one of the most important functions traditionally associated with the police power of the States." Arkansas Electric Cooperative Corp. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983).
The FPA and federal case law not only do not explicitly indicate intent to preempt, but, on the contrary, show that Congress intended to preserve state regulation of public utilities. The FPA limits federal regulation of utilities "to those matters not subject to regulation by the States." 16 U.S.C.A.  824(a). The Supreme Court stated that the FPA "had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective." Panhandle Eastern Pipe Line Co. v. Public Service Com'n of Indiana, 332 U.S. 507, 517, 68 S.Ct. 190, 195, 92 L.Ed. 128 (1947). Thus NOPSI's contention that Congress intended to occupy the field is without merit.
Second, NOPSI contends that there is a conflict between federal and state law, making dual compliance impossible. NOPSI alleges that it is unable to comply both with the FERC allocation order and with the Council's rate order. The FERC order regulates wholesale rates and the Council's order regulates retail rates. NOPSI could accept the FERC allocations and still sell Grand Gulf power off system. NOPSI is able to pay its FERC-mandated costs under the Council rate order. We find no conflict between the two orders which would hinder compliance with both.
NOPSI's third contention is that the Council's rate order frustrates the purpose of Congress in the FPA, and specifically, the FPA's delegation of responsibility for wholesale ratemaking to FERC. As stated above, the FPA left state regulation of local ratemaking intact. Therefore we find that the Council's rate order is not an obstacle to the accomplishment of the purposes of Congress in the FPA.
NOPSI further contends that federal preemption is required by the U.S. Supreme Court decisions in Mississippi Power & Light Co. v. Mississippi ex rel. Moore (MP & L), 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) and Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). The Supreme Court discussed both of these cases in its opinion in NOPSI III and found no conflict between its previous decisions and its holding in the instant case. 109 S.Ct. at 2509. The U.S. Fifth Circuit had previously distinguished both of these decisions from the present case. NOPSI III, 850 F.2d at 1075-76.
Ultimately, the question of facial preemption has already been decided by the federal courts. In NOPSI III, the Supreme Court stated that the question of facial preemption may be resolved upon inquiry within the "four corners of the Council's retail rate order." 109 S.Ct. at 2515. The Court found that the appropriate question is "whether [the Council] has a substantial, legitimate interest in regulating intrastate retail rates. It clearly does." Id. at 2516. The Court ruled that a facial preemption *966 claim is inappropriate in this case. "Nothing in this [case] is directly or even indirectly foreclosed by the federal statute, the regulations implementing it, or the case law applying it." Id. at 2517.
On appeal after remand, the U.S. Fifth Circuit did an extensive review of the facial preemption claim. NOPSI IV, 911 F.2d 993, 999-1002. It considered that claim in the light of the filed rate doctrine and the decisions in Nantahala and Mississippi Power and Light. The Fifth Circuit held that the Council's rate order is not facially preempted. Id. at 1002.
Following the United States Supreme Court and the U.S. Fifth Circuit, we hold that there is no merit to NOPSI's contention of facial preemption by federal law and find that this issue is res judicata.

b. Pretext Claim
NOPSI contends that the Council's rate order covertly operates as a "pretext" for collaterally attacking the allocations made by FERC. Thus, NOPSI argues, Council action on rates was preempted by the orders of FERC, allocated the percentage of Grand Gulf power NOPSI is required to take, as well as the wholesale rates.
Prudent management, resale options and risk reduction options were not within the scope of FERC's review when it allocated power to the various utility companies in the MSU system. FERC did not have jurisdiction to consider the proposed retail rate increase since this was not an interstate transaction filed before it for approval. 16 U.S.C.  824(e). FERC made no attempt to assert jurisdiction over the question of NOPSI's prudence in failing to act to minimize its losses. NOPSI IV, 911 F.2d at 1002. We find no conflict between the Council's rate order and the findings of FERC in this case.
NOPSI claims that the findings of the rate order were "merely a cover for the determination that the original Grand Gulf investment was unwise." 109 S.Ct. at 2515. The Supreme Court viewed this claim as basically identical to the sufficiency of the evidence question in the prudence inquiry. The pretext claim "hinges largely on the plausibility of the Council's finding that NOPSI should have, and could have, diversified its supply portfolio and thereby lowered its average wholesale costs." Id. NOPSI contends that there should be further inquiry into the Council's motivation in making the rate order. The U.S. Fifth Circuit, on appeal after remand, reviewed this contention and held that the "pretext claim has little functional difference from the state court's sufficiency of the evidence review, and motivation is not relevant." 911 F.2d at 1004.
We find no merit to NOPSI's pretext claim both for the reasons stated above and because we have found the evidence for the rate order decision to be sufficient.

3. Commerce Clause
The U.S. Constitution, Art. I, Sec. 8, Cl. 3, gives Congress the power to regulate commerce among the states. Congress must, however, manifest this intent clearly and a court cannot presume federal legislation. New York State Dept. of Social Services v. Dublino, 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973). In the absence of conflicting federal legislation, states may exercise police power over matters of legitimate local concern even though such regulations may affect interstate commerce. City of Philadelphia v. New Jersey, 437 U.S. 617, 623-24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).
The "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the states." Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. at 377, 103 S.Ct. at 1908. "Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States." Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 205, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983).
NOPSI first contends that the Council's "attempt to regulate certain aspects of Grand Gulf is a prohibited regulation of matters in interstate commerce." *967 NOPSI further claims that the Council's rate order represents an uncontrolled regulation of the production and transmission of electricity in interstate commerce. However, in fact, the Council has only regulated retail utility rates within Orleans Parish. In so doing it is within its authority under the Louisiana Constitution and under its own Home Rule Charter. The U.S. Supreme Court has found that the "Council has not sought to regulate intrestate wholesale rates." 109 S.Ct. at 2517. The authority to establish retail utility rates has not been preempted by federal legislation, as has been discussed above.
NOPSI also contends that the rate order is a form of economic protectionism, attempting to exclude high cost nuclear power from the city of New Orleans. NOPSI bases its argument on a decision of the Eighth Circuit, Middle South Energy, Inc. v. Arkansas Public Service Commission, 772 F.2d 404 (8th Cir.1985). In that case, the Arkansas Public Service Commission refused to recognize the FERC allocation to AP & L and therefore denied the inclusion of any of that allocation in retail rates. This case may readily by distinguished from the instant case, because the Council does not challenge the FERC allocations, but considers only the imprudence and negligence of NOPSI management.
A state or municipal law "must be upheld if it `regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental.'" Edgar v. Mite Corp., 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982), citing Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). State interference in the production and transmission of energy, especially when it places burdens on other states, is prohibited under the Commerce Clause. Arkansas Electric, 461 U.S. at 377, 103 S.Ct. at 1908-09; Middle South Energy, Inc., 772 F.2d at 412-17. "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Healy v. Beer Institute, Inc., 491 U.S. 324, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989).
We find that the Council has merely been engaged in the regulation of local retail rates, a proper state function, and has not sought to restrict the production or transmission of energy among the states. NOPSI's Commerce Clause argument has no merit.

4. Due Process
NOPSI contends that it has been denied due process because the Council used its legal and technical staff during both the evidentiary and the decisional phases of the hearing process. NOPSI argues that this "commingling of functions" is prohibited by law and that it deprived NOPSI of meaningful judicial review.
The Council publicly stated the procedure it would be following in its Resolution 86-43, issued on February 6, 1986. The procedure followed by the Council was in accord with this resolution and with the practice of the Louisiana Public Service Commission, which regulates rates of utilities outside of New Orleans. See LSA-R.S. 45:1163.3 and 1180(B).
According to the record, the first time NOPSI raised any objection to the implementation of the Council's procedure was eighteen months after the procedure was announced, in a letter dated July 31, 1987, addressed to Councilmember Taylor and written by NOPSI special counsel Alan Wolf. That letter did not object to the hearing procedure on the basis of any alleged violation of the Administrative Procedure Act or prohibited "commingling of functions" or denial of "meaningful judicial review." The only question of "fairness" raised by NOPSI concerned the determination of the credibility of witnesses.
NOPSI did not formally raise the "commingling of functions" issue or cite the Administrative Procedure Act until its second post-argument memorandum in the trial court, dated July 21, 1989. Thus NOPSI had acquiesced in the now-challenged procedures for more than three years, without raising these issues. Since NOPSI raised no timely objection to the Council's procedure, *968 the present due process challenge may be deemed waived.
NOPSI contends that it did not raise the issue earlier because the claim is based upon a decision of the Louisiana Supreme Court which was issued in its final form on June 29, 1989. This decision, Allen v. Louisiana State Board of Dentistry, 543 So.2d 908 (La.1989), dealt with 45 counts of misconduct brought against a dentist before the Louisiana State Board of Dentistry. This was an adjudicative proceeding. In the adjudication in Allen, the prosecutor had drafted the findings of fact and conclusions for the committee in violation of the Louisiana Administrative Procedure Act, LSA-R.S. 49:958 and 960. For this reason, the Supreme Court found that due process had been violated. 543 So.2d at 915.
The Allen decision must be distinguished from the instant case because the hearing in Allen was adjudicative. The two sections of the Louisiana Administrative Procedure Act which were violated in Allen apply only to adjudicative proceedings. Furthermore, in Allen, the role of commingling of functions was secret, raising a question of fairness. In the instant case, the procedures were on public record. Finally, in Allen, the decision maker gave no reasons for its ruling. In the instant case, the Council's rate order provides 224 pages of reasons for its decision.
NOPSI claims that the Allen decision changed the law. We disagree that it changed the law, which remains as previously stated in the Louisiana Administrative Procedure Act. See LSA-R.S. 49:958, 960. The Allen decision itself based its finding upon "the letter of the Administrative Procedure Act." 543 So.2d at 915.
A. Unless required for the disposition of ex parte matters authorized by law, members or employees of an agency assigned to render a decision or to make findings of fact and conclusions of law in a case of adjudication ... shall not communicate, directly or indirectly, in connection with any issue of fact or law, with any party or his representative, or with any officer, employee, or agent engaged in the performance of investigative, prosecuting, or advocating functions, except upon notice and opportunity for all parties to participate.
LSA-R.S. 49:960(A) (emphasis added).
The law, both federal and state, is that a "separation of functions" is required in adjudicative proceedings, but not in legislative proceedings. The federal Administrative Procedure Act requires separation of functions in adjudicative proceedings, but explicitly exempts "proceedings involving the validity or application of rates, facilities, or practices of public utilities." 5 U.S.C.A. Sec. 554(d)(B). See Marketing Assistance Program, Inc. v. Bergland, 562 F.2d 1305, 1308-09 (D.C.Cir.1977). Federal case law has established that separation of functions is not required in ratemaking proceedings on either statutory or constitutional due process grounds. American Tel & Tel. Co. v. F.C.C., 449 F.2d 439, 545-55 (2d Cir.1971); Wilson & Co. v. U.S., 335 F.2d 788, 796-97 (7th Cir.1964), cert. denied, 380 U.S. 950, 85 S.Ct. 1091, 13 L.Ed.2d 968 (1965). The U.S. Supreme Court has stated that under federal and state case law, the combination of investigative and judging functions is not a denial of due process. Withrow v. Larkin, 421 U.S. 35, 52, 95 S.Ct. 1456, 1467, 43 L.Ed.2d 712 (1975), citing 2 K. Davis, Administrative Law Treatise, Sec. 13.02, at 175 (1958). In Louisiana, the state Administrative Procedure Act distinguishes between judicial proceedings, in which separation of functions is required (LSA-R.S. 49:958, 960), and rulemaking proceedings, in which it is not (LSA-R.S. 49:953).
The procedures implemented by the Council in its ratemaking process in the instant case were not adjudicative, but legislative. The U.S. Supreme Court found in NOPSI III that: "The Council's proceedings in the present case were not judicial in nature." 109 S.Ct. at 2519. Moreover, "the Council's proceedings here were plainly legislative." Id. at 2520. The Supreme Court further held that "ratemaking is an essentially legislative act." Id. at 2520, citing Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945).
*969 The Council followed ordinary legislative procedures. It appointed a hearing officer to take testimony of experts, held public hearings, and conducted its own deliberations. The rate order of the Council, which is the decision of which NOPSI complains, includes a two page "Resolution" (R-88-14) which explicitly incorporates and acknowledges as the reasons for its decision the 224 page "Determinations and Order." The latter states in detail the reasons upon which the rate order decision is based. The "Determinations and Order" document is, on its face, ascribed to the City Council members, who are, in fact, the decision makers in the case.
NOPSI's argument based upon the prohibition of "commingling of functions" under the APA and Allen is without merit both because NOPSI waived its claim by failing to object to the challenged commingling within a reasonable amount of time after it was announced and implemented, and because state and federal law do not require a separation of functions in legislative or rulemaking proceedings. The U.S. Supreme Court has ruled that the actions of the New Orleans City Council in holding prudence hearings and promulgating its rate order were legislative proceedings. 109 S.Ct. at 2519-20. This question is res judicata.
NOPSI's second contention under Allen is that it was denied "meaningful judicial review." NOPSI finds the basis for this right in the Louisiana Constitution, Article I, Section 19. However, that section defines the "right to judicial review" in terms of a review "based upon a complete record of all evidence upon which the judgment is based." La. Const., art. I, sec. 19. In the instant case, such a complete record is before the reviewing court. Therefore no violation of the state constitutional right to judicial review has occurred.
NOPSI also claims that the Louisiana APA entitles it to meaningful judicial review. NOPSI contends that the commingling of functions in the Council proceedings effectively denied it meaningful judicial review. NOPSI is here confusing two different stages of the proceeding. The agency, in this case the Council, first makes a decision. Then the courts provide judicial review of the agency's decision. Thus it is the state courts of Louisiana which are charged by law to provide meaningful judicial review. This is not the function of the City Council.
NOPSI cites LSA-R.S. 49:964, which applies to judicial review of adjudicative proceedings. As stated above, the proceedings in the instant case were legislative, not adjudicative. However, even if they were adjudicative, Section 964 requires only that the agency decision be reviewed by the court and that the review be confined to the record. LSA-R.S. 49:964(F). The reviewing court may affirm the agency decision or reverse it if substantial rights of the appellant have been prejudiced because the decision is unconstitutional or illegal, outside the authority of the agency, made upon unlawful procedure, affected by error of law, arbitrary and capricious or characterized by an abuse of discretion, or manifestly erroneous. LSA-R.S. 49:964(G).
This court has reviewed the entire record of the disputed prudence hearings and has made its decision on the basis of the criteria listed above. Thus, even though this section of the APA applies only to adjudicative proceedings, in essence its requirements have been implemented in this case despite the fact that it is a legislative proceeding. There is no evidence in the record which would indicate a denial of NOPSI's right to meaningful judicial review in the courts of Louisiana.
For the reasons stated above, we find that the claims raised by NOPSI on the basis of the Allen decision and the Louisiana Administrative Procedure Act are without merit.

THE APPEAL OF THE ALLIANCE FOR AFFORDABLE ENERGY

1. The Quantum of Imprudent Costs
The Alliance for Affordable Energy (Alliance) has appealed the disallowance of only part of the Grand Gulf construction costs which were found by the Council to be imprudent. In order to analyze this question, it is necessary to explain and then *970 calculate the total amount of Grand Gulf construction costs and the total amount of the costs found to be imprudent.
The Council found that the imprudently incurred costs totalled approximately 31% of NOPSI's Grand Gulf costs. Rate Order at 12. According to Council Exhibit 38, the lifetime present amount of Grand Gulf construction costs is $10,242.9 million. This is based upon its present worth as of January 1, 1986. Middle South Utilities obligated itself for a 90% share of these costs, or $9,218.6 million. Of this amount, NOPSI was responsible for 17%, or $1,567.2 million. The Council found that 30.41% of NOPSI's costs were imprudently incurred. Thus the total amount of NOPSI's imprudently incurred costs is $476.58 million. There remain $1.091 billion in prudent Grand Gulf costs (that is, 69.6% of NOPSI's total Grand Gulf costs) which may legally be passed through to the ratepayers.
The Council chose to shield the ratepayers from only $186.2 million ($135 million, plus the $51.2 million from the settlement agreement) of the $476.58 million of imprudently incurred costs. The difference between the total imprudence and the amount disallowed by the rate order is $290.38 million.

2. Disallowance of Imprudently Incurred Costs
The Alliance for Affordable Energy, Citizens for Safe Energy, and Gary L. Groesch, representing consumers, contend on appeal that once costs have been found to have been imprudently incurred, then both law and public policy mandate that stockholders, not ratepayers, bear the burden of such costs. NOPSI contends that the position of Alliance is a pretext for challenging the FERC allocations. This contention is without merit and has been discussed supra.
The Council and NOPSI have both admitted that a utility may not shift imprudent costs to its ratepayers/consumers. What is at issue is whether a ratemaking body, once it has deemed certain costs imprudent, may employ a balancing of interests test and then allocate some of the imprudent costs to the ratepayers and some to the shareholders. This issue involves two questions: (1) whether a balancing test may be applied to imprudent costs, and (2) whether imprudent costs may ever be shifted to ratepayers.

a. The Use of a Balancing Test
The Alliance contends that the balancing test which the Council used to weigh the interests of the ratepayers against those of the utility's shareholders may be applied only to prudent investments, but not to imprudently incurred costs, which by law may not be passed on to the ratepayers.
The Council contends that the regulator has the right and obligation to the community to investigate the impact of a disallowance on the financial health of a utility. In addition, the Council concluded that it should not take action which might prevent NOPSI from making its FERC mandated payments for Grand Gulf. For these reasons, the Council decided to employ a balancing test. It balanced and weighed NOPSI's financial interests against the interests of the ratepayers/consumers of New Orleans, and on the basis of financial caution reduced the amount of the imprudence disallowance, permitting two-thirds of the imprudent costs to be shifted to the ratepayers. The use of this procedure for imprudent costs was unprecedented in utility regulation jurisprudence.
Heretofore, such a balancing test has been used only in cases where the costs in question were deemed prudent. In the instant case, even the Council conceded and confessed that "a regulator has no general obligation to set rates so as to keep a utility solvent notwithstanding its imprudence." Rate Order at 179. A witness for NOPSI, investment banker Robert Jones, also admitted that investors cannot rely on the recovery of imprudently incurred expenses. The Council and NOPSI have been unable to cite and we have been unable to locate any legal authority that authorizes a regulator to pass through to the ratepayers any portion of the expenses found to be imprudently incurred.
*971 Yet contrary to its own admission above, the Council decided to balance the financial interests of NOPSI against the interests of the ratepayers, basing the decision solely on its desire to preserve NOPSI's solvency.
The Council attempted to justify its position in using a balancing test as an exercise of regulatory flexibility, by citing Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 620, 102 L.Ed.2d 646 (1989). Duquesne dealt with prudent investments which had been abandoned before completion. Pennsylvania has a statute which disallows costs which are not "used and useful," that is, which are not actually used in producing power for public consumption. Pa.Cons.Stat.Ann., Tit. 66, Sec. 1315. Costs which were not "used and useful in service to the public" cannot be passed through to consumer rates. In Duquesne, the costs in question were deemed prudent, but not "used and useful." On balance, since the amount of abandoned investment was not large enough to threaten the solvency of the utility, the regulator had the flexibility to exclude these prudent, but not used or useful, investments from rates. In the instant case, however, the issue is expenses found to be imprudent because of the negligence of the utility's management. Louisiana law has no "used and useful" exclusion. Furthermore, the costs in Duquesne were prudent costs. The Duquesne decision does not justify the application of a balancing test in a case where the costs were found to be imprudent.
The Council cited the balancing test described by the Supreme Court in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944), which involved the balancing of investor versus consumer interests. Hope dealt with the question of the "fair value" to be realized on investments not found to be imprudent. Hope provides no guidance concerning the use of a balancing test when costs have been found to be imprudent. Consumers obviously do not have an interest in bearing the imprudently incurred expenses of a utility. Hope does not provide legal justification for the Council's use of a balancing test.
The U.S. Supreme Court has long held that a regulated public utility has no constitutional right to make a profit or to receive net revenues. Hope, 320 U.S. at 603, 64 S.Ct. at 288; Federal Power Commission v. Natural Gas Pipeline, 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942). Even the financial survival of a utility company is not sufficient reason for assigning high rates to the public. Market Street Railway Co. v. Railroad Comm'n of California, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945).[5]
Thus there is no basis in law for the use of a balancing test in a case where costs have been found to be imprudent. This court finds no reason to change or extend the law to allow other interests to justify the shift of imprudent costs to ratepayers and the public.

b. The Disallowance of Imprudent Costs
The larger question is whether the Council has the right ever to decline to disallow any portion of the costs it had found to be imprudent. As there is no legal precedent for the use of a balancing test in regard to imprudently incurred *972 costs, so, likewise, there is no legal basis for the failure to disallow any part of costs found to be imprudent.
In the instant case, both the Council and NOPSI have admitted that costs found to be imprudent may not be passed through to the ratepayers. In its rate order, the Council admitted that its findings were based upon "the longstanding principle that costs may be passed on to the ratepayers only to the extent that they have been prudently incurred." Rate Order at 31, citing Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923) (Brandeis, J., concurring). In its brief on appeal, the Council reiterates the "uniform rule ... that a utility's shareholders, not its ratepayers, must bear the costs of bad management." Council Brief at 12, n. 6. Even NOPSI did not disagree with the principle that if the prudence investigation is lawful, the Council must "fully implement its findings into an appropriate order." NOPSI Brief, at 69. After finding NOPSI's actions and omissions to be negligent and imprudent, the Council took "the normal ratemaking step of making NOPSI's shareholders rather than the ratepayers bear the consequences." NOPSI III, 109 S.Ct. at 2517.
The expenses of a utility may be passed on to the ratepayers, absent a "showing of inefficiency or improvidence." West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935). The key criterion for a ratemaking body to decide which costs may be passed through and which must be disallowed is whether the expenses were incurred prudently or imprudently. The purpose of a regulatory agency is "to protect power consumers against excessive prices" by assuring that costs passed-through into utility rates are just and reasonable. Pennsylvania Water & Power Co. v. Federal Power Commission, 343 U.S. 414, 72 S.Ct. 843, 845, & 845 n. 5, 96 L.Ed. 1042 (1952). Such protection should exclude all costs which have been extravagantly or unnecessarily incurred. Acker v. United States, 298 U.S. 426, 430-31, 56 S.Ct. 824, 827, 80 L.Ed. 1257 (1936). The Louisiana Supreme Court has likewise stated with approbation that "ratepayers should not bear the burden of a utility's imprudence." South Central Bell Telephone v. Louisiana Public Service Commission, 352 So.2d 964, 972-73 (1977), cert. denied, 437 U.S. 911, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978).
Since the Hope decision, "the Supreme Court has repeatedly emphasized that the primary purpose of federal [and state] regulation of the natural gas and electric industries has been to protect consumers from unreasonable prices charged by utilities that take advantage of their monopoly or near-monopoly status." Drobek, From Turnpike to Nuclear Power: The Constitutional Limits on Utility Rate Regulation, 65 Boston U.L.Rev. 65, 95 (1985). In addition, the "Supreme Court's ratemaking cases demonstrate that a substantial public interest can justify a good deal of economic harm to the investor interest without violating the Constitution." Id. at 97.
When the New York Public Service Commission disallowed approximately $1.4 million in imprudent costs incurred in the construction of the Shoreham nuclear power plant, it wrote:
[W]e regularly deny recovery of costs that have resulted from imprudent actions. These disallowances are a fundamental part of our responsibility to set just and reasonable rates and are necessary to protect the public from being victimized by the monopoly power of a public utility. If a competitive enterprise tried to impose on its customers costs from imprudent actions, the customers would take their business to a more efficient provider. A utility's ratepayers have no such choice. A utility's motivation to act prudently arises from the prospect that imprudent costs may be disallowed.
In Re Long Island Lighting Co., 71 P.U.R. 4th 262, 266 (N.Y.Pub.Serv.Com'n., 1985), affirmed in Long Island Lighting Co. v. Public Service Com'n, 134 A.D.2d 135, 523 N.Y.S.2d 615 (1987). The New York Supreme Court held that "[i]t would be neither just nor reasonable for a utility's customers *973 to bear the cost of inefficient management or poor planning." 523 N.Y. S.2d at 620.
In the instant case, the Grand Gulf nuclear power plant project has been characterized by a federal court of appeal as "catastrophically uneconomical." Mississippi Industries v. F.E.R.C., 808 F.2d 1525, 1528 (D.C.Cir.1987). A public utility which has imprudently managed its own involvement in such a project should not be guaranteed the right to solvency. Dr. Jeffrey Barach of Tulane University School of Business testified that "[o]nce the leadership of a business finds out that it cannot lose, it can no longer be held accountable for the reasonableness of its decisions." Dr. Barach suggested that the Council's decision to limit the amount of the disallowance would signal management "that grossly imprudent acts are better than slightly imprudent acts." The costs of a slightly imprudent act could be written off, since they would not threaten the company's viability. However, the costs of a grossly imprudent act, such as the management of the Grand Gulf project, would "be borne only fractionally by the stockholders because its sheer magnitude threatens the company." This could encourage the management of NOPSI or other utilities to undertake even more expensive imprudent projects in the future, since then a larger portion of the costs would be passed on to the ratepayers.
"The concept of a prudent investment in public utility law is a regulatory oversight standard that attempts to serve as a legal basis for judging whether utilities meet their public interest obligations." R. Burns, R. Poling, M. Whinihan, and K. Kelly, The Prudent Investment Test in the 1980s, iv (1985). This court strongly affirms the importance of the prudence standard for motivating public utilities to prudent management of their affairs and for protection of the interests of the ratepaying public against excessive and unjust utility rates.
The U.S. Supreme Court has held that a "public utility will not be permitted to include negligent or wasteful losses among its operating charges." West Ohio, 294 U.S. at 68, 55 S.Ct. at 319. In even stronger language, the Supreme Court held that when charges are for public service, "regulation cannot be frustrated by a requirement that the rate be made to compensate extravagant or unnecessary costs for these or any purposes." Acker v. U.S., 298 U.S. at 431, 56 S.Ct. at 827 (emphasis added).
Thus the law does not recognize any justification for failure to disallow all costs found to have been imprudently incurred by a utility. The ratemaking body acted contrary to law in weighing the financial state of NOPSI and in deciding to disallow only a portion of the $476.58 million of Grand Gulf costs found to be imprudent. This decision is also contrary to public policy.
This Court finds that the reasons articulated by the Council for reducing the disallowance of the pass through to the ratepayers of the totality of costs found to be imprudently incurred were insufficient and contrary to law and public policy. Imprudently incurred costs cannot legally be passed on to the ratepayers/consumers. If the Council did illegally pass imprudent costs through, such action would be in violation of the ratepayers' constitutional rights to property and due process of law under the Louisiana Constitution, Art. I, Sections 2 and 4, and the U.S. Constitution, Amendments 5 and 14.
A utility does not enjoy an absolute right to solvency or profit. A public utility is a monopoly which exists in a non-competitive market. Because a utility enjoys such a great economic advantage, it owes a high duty of prudence to its consumers in decision making, operation and management. Regulators of utilities must strictly inspect and examine them since such entities are without competition in a free market. Power consumers are unable to select an alternative utility for power. Consumers possess federal and state constitutional rights to protect them against the taking of their property without due process of law. When power costs are increased and shifted to consumers, the latter must accept the increases without recourse. Therefore the pass through of *974 imprudent costs to ratepayers/consumers is prohibited by law. The public ought not to bear the burden of utility imprudence or misconduct.
Further, the stockholders of a utility have no right to a profit as a matter of law. A utility would have no incentive to behave prudently in its transactions if it bore no risk of loss. Law and public policy in their present form encourage utilities to manage their affairs in a prudent manner. Modification of the existing legal rules would not only sanction imprudent utility management and operation, it would also promote waste, inefficiency and misconduct at public expense. Therefore, we decline to change the law or establish a new remedy for imprudently incurred costs.
As a result of its improper use of a balancing test, the Council chose to disallow only $150 million of NOPSI's imprudently incurred costs. The Council then made a further decision to reduce the $150 million disallowance by ten percent, or $15 million, to $135 million, even though the Council admitted that its experts had found that NOPSI could sustain a disallowance of $150 million. Rate Order at 13 and 220. The Council generously decided that "as a matter of caution and conservatism," this ten percent reduction would "provide a buffer or margin ... to allow for the uncertainty inherent in financial projections and for the possibility that circumstances could change to NOPSI's detriment." Id.
The reduction of the $150 million disallowance by ten percent is manifestly erroneous. It is unreasonable, arbitrary and contrary to the evidence in the record, which shows that NOPSI could withstand a disallowance of $150 million or more. The reduction of the disallowance by $15 million is reversed because it is contrary to the evidence. At the same time, the entire reduction of the total amount of imprudent costs is reversed because it is contrary to the law and public policy. The original finding of the Council that approximately 31% of NOPSI's total Grand Gulf costs were imprudently incurred is affirmed, and the rate order is amended to restore the full amount.

CONCLUSION
This Court affirms the February 4, 1988, rate order of the New Orleans City Council in its findings that NOPSI imprudently incurred approximately 31% of or $476.58 million of its Grand Gulf costs. We find that the prudence investigation conducted by the Council was legal and proper, and that the findings and conclusions of the Council were just, reasonable and based upon substantial evidence. We also find that that the Council did not challenge the FERC allocation or the wholesale rates fixed by FERC, that the Council did not in any way violate federal or constitutional law, and that the procedures which it employed were legal and proper.
We affirm the rate order and the decision of the district court as to the above findings. We amend the rate order to disallow the pass through by NOPSI to the ratepayers of New Orleans of any of the imprudently incurred costs, including an additional $290.38 million not previously disallowed, or a total disallowance of $476.58 million.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART.

ON APPLICATION FOR REHEARING
New Orleans Public Service, Inc. (NOPSI), has made application to this court for rehearing of our decision in Alliance for Affordable Energy, Inc. v. Council of the City of New Orleans, consolidated with Lambert Boissiere, Jr. v. James M. Cain, consolidated with New Orleans Public Service, Inc. v. Council of the City of New Orleans, Nos. 90-CA-0420, 90-CA-0421, 90-CA-0422 (La.App. 4 Cir. April 4, 1991) (Alliance) on the basis of the decision of the Louisiana Supreme Court in Gulf States Utilities Company v. Louisiana Public Service Commission, 578 So.2d 71 (La.1991) (GSU). For the reasons discussed below, we hold that the GSU decision does not affect our decision in Alliance and deny rehearing.
In GSU, the Louisiana Supreme Court reviewed the decision of the Louisiana Public Service Commission (LPSC) concerning *975 the prudence of GSU's decision to restart its River Bend nuclear power plant project.
The Supreme Court first reviewed the procedures used by the LPSC in its prudence hearing and found that they satisfied the requirements of due process. These procedures were basically the same as those used by the New Orleans City Council in its hearings on the prudence of NOPSI in its involvement in Grand Gulf I. The Supreme Court held that judicial inquiry into such procedures is at an end. GSU, at 84. This holding supports our finding that due process requirements were satisfied in Alliance, and forecloses and finalizes this issue.
The Supreme Court next reviewed the evidence in the record before the LPSC concerning the imprudence of GSU and found that "the Commission's order finding that Gulf States was imprudent to restart River Bend in 1979 is reasonably supported by the evidence, and is neither arbitrary or capricious." GSU, at 93-94. Both in its method of reviewing this question, and in its finding, the Supreme Court's decision supports our holding in Alliance that the rate order of the New Orleans City Council, which found NOPSI imprudent in incurring $476.58 million of the costs of the Grand Gulf I nuclear power plant, was based upon substantial evidence, and was not arbitrary or capricious.
The only issue on which there may be apparent disagreement between the two opinions is concerning the question of whether a ratemaking body may lower an imprudence disallowance on the basis of the possible insolvency of the utility. In the GSU case, the LPSC had found a total of $2 billion to be imprudent, but only disallowed $1.4 billion. The Supreme Court in GSU seems to accept the use of a balancing test for modification of an imprudence disallowance. GSU, at 95-96.
The Supreme Court correctly points out that federal law and United States Supreme Court decisions do not insure that a public utility must "produce net revenues," or that the ratemaker set rates "at a level that will guarantee the continued financial integrity of the utility." GSU, at 95.
The confusion arises when the Supreme Court discusses the use of a balancing test. It is correct that the use of a balancing test is approved by federal law for ratemaking in general, that is, for balancing interests apropos of the inclusion of prudent costs in consumer rates. However, nowhere in federal law or in U.S. Supreme Court decisions is a balancing test ever used to modify an imprudence disallowance.
Alliance and GSU may be distinguished in that GSU dealt with imprudent investments (in its decision to restart the River Bend project), whereas Alliance dealt with imprudent costs (incurred during the construction of Grand Gulf I). The law is unequivocally clear as to the prohibition against modifying the disallowance from the rate base of imprudently incurred costs. The U.S. Supreme Court held that "regulation cannot be frustrated by the requirement that the rate be made to compensate extravagant or unnecessary costs for these or for any purposes." Acker v. U.S., 298 U.S. 426, 431, 56 S.Ct. 824, 827, 80 L.Ed. 1257 (1936) (emphasis added).
The only authorities cited by the Louisiana Supreme Court in GSU for allowing balancing to modify an imprudence disallowance are the Louisiana Constitution and the New Hampshire Supreme Court case Appeal of McCool, 128 N.H. 124, 514 A.2d 501 (1986).
The Louisiana Constitution. art. 4, sec. 21(B) gives the LPSC the authority to regulate public utilities. LSA-R.S. 45:1176 gives the LPSC the authority to investigate and fix reasonable rates. South Central Bell Tel. v. Louisiana Public Service Comm'n, 352 So.2d 964, 968 (La.1977). The constitution and statutes of Louisiana do not grant the LPSC or the courts the authority to modify an imprudence disallowance.
The McCool case dealt with a decision of the New Hampshire Electric Cooperative, Inc., to borrow $46,898,000 to finance completion of the Seabrook I nuclear power plant. The Commission had the obligation "to consider the public good" in evaluating a financing request and determining whether such financing would result in reasonable *976 rates. McCool, 514 A.2d at 513. Although no formal prudence hearings were held in McCool, the court cited the "principle of prudence" which "requires that an investment or constituent element of an investment that was foreseeably wasteful when made be excluded from the rate base." Id. Such principles of ratemaking preclude "a guarantee of survival to the utility." Id. at 514. The court in McCool cited its earlier decision in Appeal of Conservation Law Foundation of New England, Inc., 127 N.H. 606, 507 A.2d 652 (1986) (CLF). CLF concerned an order of the Public Utilities Commission to authorize a bond issue to finance construction of Seabrook I. Like McCool, CLF did not involve formal prudence hearings. The court did utilize the principle of prudence, which it defined as a "standard for determining whether to exclude value from rate base." 507 A.2d at 673. The principle of prudence "requires the exclusion from the rate base of costs that should have been foreseen as wasteful." Id. (emphasis added).
If the entire investment in a given asset was foreseeably wasteful, the entire investment must be excluded; if only some of the constituent costs attributable to a given asset were foreseeably wasteful, the value of the rate base must be reduced accordingly.
CLF, 507 A.2d at 673. In its summary of the standards for ratemaking, the CLF court held that reasonable rates may be based upon "cost-less-depreciation of used and useful property, provided that cost may not include anything imprudently wasteful." 507 A.2d at 674 (emphasis added). The dissent in CLF also cites a decision of the Massachusetts Supreme Judicial Court in Fitchburg Gas & Elec. L. v. Dept. of Pub. U., 395 Mass. 836, 483 N.E.2d 76 (1985), which held that whether or not Seabrook I ever became operable, Massachusetts utilities could only pass prudent costs through onto the rate base. CLF, 507 A.2d at 688-89. Thus neither McCool nor CLF supports the position taken in GSU.
The New Hampshire Supreme Court refused to bail out a utility which would become insolvent absent a change in the principles of ratemaking. It stated that the "risk of failure was present in this enterprise [investment in a utility constructing a nuclear power plant] as with any other business venture." Petition of Public Service Co. of N.H., 130 N.H. 265, 539 A.2d 263, 271 (1988).
The [U.S.] Supreme Court has expressly held that it is not the mandate of the constitution to rejuvenate the value of investments of a company whose `zenith of opportunity' has been eclipsed by the operation of economic forces.
539 A.2d at 270, citing Market St. R. Co. v. Comm'n, 324 U.S. at 554, 65 S.Ct. at 774. Thus New Hampshire jurisprudence does not permit the use of a balancing test to modify the disallowance of imprudently incurred costs.
GSU also cites the Pennsylvania Supreme Court case of Pennsylvania Elec. Co. v. Pennsylvania Pub. Util. Comm'n, 509 Pa. 324, 502 A.2d 130 (1985). This case dealt with ratemaking in Pennsylvania after the Three Mile Island accident, which diminished the financial viability of the three utility companies which owned the Three Mile Island plant. The sole issue in this case was whether Hope required setting rates which would guarantee the continued financial solvency of the utilities. 502 A.2d at 132, citing Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The Pennsylvania Supreme Court found that Hope does not require setting rates which will "guarantee the continued financial integrity of the utility concerned." Id. at 133. The court noted that the utility has encountered one of the risks which may "imperil any business venture, namely, the risk of financial failure. The express language of the Hope decision weighs against regarding utilities as a protected class of business enterprises which are to be relieved of such normal business risks." Id. at 134. Consumers "should not be required to buoy up failing utility companies by being required to, in effect, provide public subsidies for utility properties that are not useful in the public service." Id. at 135. The Pennsylvania court noted that *977 the New Jersey Superior Court had just reached the identical decision regarding the involvement of New Jersey utilities in Three Mile Island. Id. at 136.
Thus the overwhelming view of the U.S. Supreme Court and the supreme courts of other states is that (1) use of a balancing test to modify an imprudence disallowance is forbidden, and (2) there is no constitutional or other requirement for a ratemaking body to elevate rates in order to maintain the solvency of a utility.
On the basis of existing consistent jurisprudence, statutes and public policy, we reaffirm our decision in Alliance. The evidence in the record of that case is insufficient to prove that a larger imprudence disallowance would have caused NOPSI to become bankrupt in 1988. And there was no evidence in the record as to NOPSI's financial condition in 1991. However, even if NOPSI had proven that the full disallowance would have made it insolvent, the law did not authorize the Council to modify the full disallowance on the basis of the disallowance of the full amount causing the utility to become insolvent.
The GSU decision is not yet final because of pending rehearing applications. With all due respect for the Louisiana Supreme Court, we do not believe that it intended to adopt a new remedy which would be contrary to the law of the United States Supreme Court, the supreme courts of other states, and other legal authority, by permitting a balancing of the financial interests of a utility to modify the disallowance of investments found by the ratemaking agency to have been imprudent. In addition, the GSU Court did not consider or analyze the public policy implications of such a dramatic change in the jurisprudence.
As we stated in our original opinion, neither law nor public policy authorize or condone a reduction of the disallowance of expenses found to be imprudent on the basis of the financial effect on the utility.
For these reasons, we reaffirm our holding that the City Council had no legal right to lower its imprudence disallowance from $476.58 million to $186.2 million and that the law of the United States requires that the full amount be reinstated.
Therefore the application for rehearing is denied.
NOTES
[1] Except the area called Algiers, which is serviced by LP & L.
[2] The Board of Directors of MSE is composed of the presidents of the MSU operating companies and the president of MSU. MSE owns 90% of Grand Gulf I. Southern Mississippi Electric Power Association owns the other 10%. Technical services were provided by another MSU subsidiary, Middle South Services, Inc. (MSS).
[3] When Grand Gulf I became operational in July 1985, the construction costs totalled approximately $3.654 billion, or approximately $3 billion more than the original estimate of $600 to 800 million, an increase of 450% to 600%.
[4] NOPSI also contends that FERC could have allocated the savings resulting from off system sales to the MSU system as a whole and thus reduced the savings of NOPSI. There is no evidence in the record to support this contention. Likewise there is not evidence to support NOPSI's contention that it would have had to sell Grand Gulf power off system at a reduced price.
[5] During the hearings held from October 21-24, 1986, the Attorney General of Louisiana intervened and stated that NOPSI's imprudently incurred costs should not be considered when setting retail rates and that the City should have examined Chapter 11 bankruptcy as "an available and appropriate means of distributing imprudently or illegally incurred costs" if NOPSI were unable to absorb them. In addition, Citizens for Safe Energy (SAFE), introduced testimony of Theodore Eisenberg, who was qualified as an expert in bankruptcy and financial reorganization, and who testified that reorganization through Chapter 11 bankruptcy could have significant advantages both for the consumer and for investors. No evidence was produced to show that such a reorganization would prevent implementation of the FERC allocation plan or prevent NOPSI from paying its share of Grand Gulf. The Council chose not to consider the proposed option of Chapter 11 bankruptcy as an alternative to the pass through of imprudently incurred costs. On appeal, the Alliance contends that this decision was in error. We find that the Council's decision not to consider the possibility of reorganizational bankruptcy to have been erroneous. However, the issue is moot because the Council should not have used a balancing test in the first place.